ARCHITECTS COLLECTIVE, a Sole
Proprietorship of Larry Kester,
Plaintiff,

v.

PUCCIANO & ENGLISH, INC.,
a Georgia Corporation,
Defendant.

CIVIL ACTION NO. 1:15–cv–00842–AT

United States District Court,
N.D. Georgia, Atlanta Division.

Signed March 29, 2017

Brenna Nicole Wiebe, Thomas M. Askew, Wm. Greg James, Riggs, Abney, Neal, Turpen, Orbison & Lewis PC, Tulsa, OK, Chad C. Taylor, Riggs, Abney, Neal, Turpen, Orbison & Lewis PC, Oklahoma City, OK, Martha Logan Decker, Steven G. Hill, Hill Kertscher & Wharton, LLP, Atlanta, GA, for Plaintiff.

Jeffrey William Melcher, Tawana Blocker Johnson, Wilson Elser Moskowitz Edelman & Dicker LLP, Atlanta, GA, for Defendant.

## ORDER

Amy Totenberg, United States District Judge

Architects Collective, a sole proprietorship of architect Larry Kester, brought this action for alleged copyright infringement against a competing architecture firm, Pucciano & English, Inc. ("Pucciano & English"). Kester contends that Pucciano & English copied Kester's federally-registered architectural plans for Unit A1 (one bedroom), Unit B2 (two bedroom), Unit C2 (three bedroom) apartment units. Plaintiff asserts that Architects Collective's and Pucianno & English's shared client, Crowne Partners, was the conduit by which Defendant obtained Architects Collective's plans for the three individual apartment unit plans.

Defendant's Motion to Exclude Expert Testimony of Larry Kester [Doc. 81] and Defendant's Motion for Summary Judgment [Doc. 82] are pending before the Court. In the Motion to Exclude, Defendant seeks to prevent Larry Kester from offering any testimony regarding the similarities between the Architects Collective plans and the Pucianno & English plans. In the Motion for Summary Judgment, Defendant seeks judgment as a matter of law in its favor that: (a) Plaintiff does not own valid copyrights in his plans, or (b) that the Pucianno & English plans do not infringe the Architects Collective plans because the plans are are not substantially similar.

The Court's rulings are set forth below.

## I. BACKGROUND [1]

Architects Collective is a sole proprietorship owned by Larry Kester. (Def.'s

---

1. A citation to Defendant's Statement of Material Facts herein indicates that there is no dispute by the Plaintiff. Likewise, a citation to

Stmt. Mat. Facts ("Def.'s SMF") ¶ 1.) Larry Kester is a licensed architect in 30 states. (Expert Deposition of Larry Kester ("Kester Expert Dep.") at 39; Kester CV, Doc. 87–4.) He has served as the owner and founder of Architects Collective for 35 years. (Kester CV, Doc. 87–4.) Roughly ninety (90%) percent of Mr. Kester's work at Architects Collective is designing multi-family housing (i.e. apartments). (*See* Kester Expert Dep. at 36.) Throughout his career, he has designed approximately 365 multifamily projects. (*Id.* at 45.)

From 1987 to 2011, Mr. Kester designed approximately 25 garden style apartment communities for Crowne Partners. (*Id.* ¶¶ 2–3.) Kester designed Crowne at Hattiesburg, Crowne at Swift Creek, and Crowne Lake for Crowne Partners. (*Id.* ¶ 5.) Each of these projects contained various individual unit plans, including a one bedroom unit designated Unit A1; a two bedroom unit designated Unit B2; and a three bedroom unit designated Unit C2. (*Id.* ¶ 6.)

Kester, doing business as Architects Collective, applied for and received copyright registrations for each of these projects. (*Id.* ¶ 8; Doc. 82–2 at 38–40, 42.) Kester certified on the copyright application for each project that he was the sole author of each work. (Def.'s SMF ¶ 9.) Kester did not indicate on the copyright applications whether other individuals provided design services for each project or that the projects were derivative works.

(*Id.* ¶¶ 10–11.) The deposit that Kester submitted to the Copyright Office with the applications was not a complete set of plans. (*Id.* ¶ 12.)

In 2011, due to growing competition in the market, Crowne Partners decided to move away from developing garden style apartments and shifted to a mid-rise product, which would allow for more units on less land. (Deposition of Alan Levow [2] ("Levow Dep.") at 60.) Crowne Partners was not satisfied with Larry Kester's design plan for the mid-rise concept and felt he did not have the necessary level of experience with that particular format as opposed to the garden style. (*Id.* at 61–63.) As a result, Crowne Partners retained David English of Defendant Pucciano & English to design the plans for its new mid-rise concept communities at Crowne at Maybank, Crowne at Cahaba River, Crowne on Timberline, and Crowne at Cary Place.[3] (*Id.* at 61–62; Def.'s SMF ¶ 16.)

Crowne Partners had hard copies of the Architects Collective plans in its possession from previous projects. (Pl.'s Add'l Mat. Facts ("Pl.'s SMF") ¶ 8.) After hiring Pucciano & English in 2011 to replace Architects Collective, Alan Levow asked Butch Rigsby [4] to send architectural plans of Kester's most current jobs for Crowne Partners to Pucciano & English. (Deposition of Harold D. "Butch" Rigsby ("Rigsby Dep.") at 15–16; *see also* Def.'s SMF ¶ 23.)

---

Plaintiff's Additional Statement of Material Facts herein indicates that there is no dispute by Defendant. Where a Statement of Material Fact is disputed, the Court will cite to the parties' (Plaintiff's or Defendant's) Response to the Statement of Material Fact, and/or to the exhibit or deposition testimony relied on in support of or opposition to the Statement of Material Fact.

2. Alan Levow is a real estate developer and principal of Crowne Partners. He does not have a titled position with the company. (Levow Dep. at 8.)

3. Some of Ms. Howard Depree's suggestions were incorporated into the final individual unit plans, but otherwise, all of the individual unit plans were designed by Mr. English. (Def.'s SMF ¶ 18.)

4. At the time, Butch Rigsby was employed by Crowne Partners and worked on the construction site building for the projects designed by Larry Kester. (Rigsby Dep. at 9.)

Rigsby "respectfully declined" to do so "because of the copyright infringements." (*Id.* at 16.) Around that same time in 2011, Levow asked Rigsby to approach Kester about Crown Properties' purchasing a license to use Kester's architectural plans because Crowne Partners liked certain units Kester had designed.[5] (Rigsby Dep. at 23–24; Levow Dep. at 24–25.) Kester declined the offer. (Levow Dep. at 24–25.) According to Alan Levow, no one from Crowne Partners ever gave copies of Kester's architectural plans to Pucciano & English. (Levow Dep. at 42–43.) Alan Levow enlisted the help of a second architect, Laura Howard Depree, to help Pucciano & English finalize some of the individual unit plans for the new projects. (Def.'s SMF ¶ 18.) Levow testified that Depree asked to see Crowne Partner's prior plans designed by Kester because she had no experience designing plans for apartments, but that he did not share them with her. (Levow Dep. at 43–44.) And according to David English, the first time he saw Kester's architectural plans were when this lawsuit was filed. (Deposition of David English ("English Dep.") at 29.)

The projects designed by Mr. English for Crowne Partners contained a variety of individual unit plans. Specifically, the plans contained a one bedroom unit in Crowne at Maybank designated Unit A4; a two bedroom unit that appears in all four projects designated as Unit B2; and a three bedroom unit that appears in all four projects designated as Unit C1. (Def.'s SMF ¶ 26.)

In approximately November 2014, Larry Kester allegedly discovered that Crowne Partners was using individual unit plans (Pucciano & English Unit A, Unit B, and Unit C) that he considered were copied from plans that he designed (Architects Collective Unit A, Unit B, and Unit C).

(Def.'s SMF ¶ 200.) Kester filed suit for copyright infringement under the Copyright Act on March 24, 2015, alleging that Pucciano & English's plans for the Crowne at Cahaba River, Crowne at Timberline, Crowne at Maybank Village, and Crowne at Cary Place projects are virtually identical to Architects Collective's plans for Crowne at Hattiesburg, Crowne at Swift Creek, and Crowne Lake. (Compl. ¶¶ 9, 10, 13; Compl. Exs. A & B.) Architects Collective alleges that the plans are substantially similar "in the following respects, among others: the same number of units per floor, the same arrangement of dwelling units within each building, the same arrangement of spaces within each dwelling unit, placement of unit amenities, and configuration of units." (*Id.* ¶¶ 10, 17.) Plaintiff attached an "Exemplar of the similarity in plans" as Exhibit B to the Complaint, consisting of the following:

(1) A two bedroom unit plan designed by Defendant, (Doc. 1–2 at 2);

(2) A two bedroom unit plan designed by Plaintiff, designated "Unit Plan—B2," (*id.* at 3);

(3) A three bedroom unit plan designed by Defendant, (*id.* at 4); and

(4) A three bedroom unit plan designed by Plaintiff, designated "Unit Plan—C2.2," (*id.* at 5).

Subsequently in discovery, Plaintiff identified additional unit plans—a one bedroom unit plan designated as Unit A1 and a three bedroom unit plan designated as Unit C2, alleged to have been infringed by Defendant's plans. Although the Complaint was never formally amended to specifically reflect allegations regarding these additional plans, Defendant has not challenged Plaintiff's reliance on these plans in support of its infringement claims.

---

5. Levow further testified that Crowne offered to purchase a license from Kester after this litigation was filed.

In general, Larry Kester contends that the architectural designs of Architects Collective and Pucciano & English have the following similarities:

### One Bedroom Units (A1 and A4)

1. Overall form, look and feel of the dwelling units;
2. Overall layout of primary spaces and certain secondary spaces of the dwelling units;
3. Kitchen arrangements and arrangement of kitchen appliances;
4. Nine (9) foot ceiling heights;
5. Vaulted ceilings in top floor units;
6. Crown molding in living and dining rooms;
7. Location of wall mounted air handler and low boy water heater spaces; and
8. Use of ceiling fans.

### Two Bedroom Units (B2)

1. Overall form, look and feel of the dwelling units;
2. Overall layout of primary spaces and certain secondary spaces of the dwelling units;
3. Kitchen arrangements, arrangement of kitchen appliances, and use and location of kitchen windows;
4. Location of all windows in dwelling units;
5. Use of long two lavatory vanities in master bath;
6. Use of garden tubs in master bath;
7. Location of laundry room;
8. Location of patio/balcony access door;
9. Use of full glass patio/balcony access door;
10. Location of plumbing walls;
11. Location of all doors in dwelling units;
12. Use of U-shaped kitchen;
13. Nine (9) foot ceiling heights;
14. Vaulted ceilings in top floor units;
15. Specifically designed crown molding in living and dining rooms;
16. Location of fireplaces;
17. Location of wall mounted air handler and low boy water heater spaces;
18. Use of ceiling fans.

(Ex. L to Pl.'s Resp., Doc. 90–12 at 6–9.) For the three bedroom units, Larry Kester contends that the architectural designs of Architects Collective's C2 Unit and Pucciano & English's C1 Unit have the same "overall form, look and feel of the dwelling units" and the same "overall layout of primary spaces and certain secondary spaces of the dwelling units."[6] (*Id.*; Ex. N to Pl.'s Resp., Doc. 90–14 ¶¶ 57–58.) Kester identified other specific similarities between the Architects Collective A1/B2/C2 unit plans and the Pucciano & English A4/B2/C1 unit plans, discussed in detail below in the Court's infringement analysis.

Side-by-side comparisons of the individual unit floor plans, as prepared and offered by Larry Kester, are shown below:

**One Bedroom Unit**

**6.** In a section of Plaintiff's Exhibit N identified as "Three Bedroom (C) Units," Kester discusses similarities between Architects Collective Unit C2 and Pucciano & English's Unit C1. (See Ex. N at 6–11.) Included within this discussion, however, at paragraphs 59–62 and 67–68, are references to features of the two bedroom B2 Units (the presence of 9' ceilings, the use of specifically designed crown mold-ing, and the layout of the water heater and furnace set up). While this may be the result of a typographical error, the Court cannot make that assumption because the Court is unable to verify the accuracy of the statements from the plans. Accordingly, the Court disregards these paragraphs in its consideration of the alleged similarities of the C2 and C1 plans.

| UNIT PLAN A1 | UNIT PLAN A4 |
| --- | --- |
| ARCHITECTS COLLECTIVE | PUCCIANO & ENGLISH |
| REFER TO AC SWIFT CREEK PLANS INCLUDED | REFER TO P&E MAYBANK PLANS INCLUDED SHEETS A4, A27, A28 and A29 |

## Two Bedroom Unit

| UNIT PLAN B2 | UNIT PLAN B2 |
| --- | --- |
| ARCHITECTS COLLECTIVE | PUCCIANO & ENGLISH |
| REFER TO AC SWIFT CREEK PLANS INCLUDED | REFER TO P&E CARY PARK PLANS INCLUDED SHEETS C1, A1 through A6 |

## Three Bedroom Unit

UNIT PLAN C2
ARCHITECTS COLLECTIVE
REFER TO AC SWIFT CREEK
PLANS INCLUDED

UNIT PLAN C1
PUCCIANO & ENGLISH
REFER TO P&E CARY PARK PLANS INCLUDED
SHEETS C1, A1 through A6

(Ex. 3 to Pl.'s Resp. to Def.'s SMF, Doc. 89–3.)

## II. DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LARRY KESTER [DOC. 81]

Plaintiff Architects Collective offered its principal, Larry Kester, as an architectural expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) to rebut Defendant's expert testimony discussing the similarities and differences between Plaintiff and Defendant's architectural plans. Defendant seeks to exclude Kester's expert testimony. It argues that Kester is unqualified to testify about copyright law and its applicability, Kester's legal analysis of copyright law and its applicability lacks "any" methodology, Kester's opinions will not assist the trier of fact, and Plaintiff was erroneously identified as a Rule 26(a)(2)(C) expert, and therefore failed to submit an expert report as required under Rule 26(a)(2)(B). (Def.'s Mot. Exclude at 11.) In particular, Defendant argues that Kester offers the following overarching opinions which should be excluded: (1) opinions on copyright law and its applicability to architectural works; (2) opinions on the alleged substantial and striking similarities between Architects Collective's unit plans and Pucciano & English's plans; and (3) opinions on Pucciano & English's gross revenues and Architects Collective's lost profits. (*Id.* at 2–3.)

In response, Plaintiff argues that Kester's observations, explanation and analysis of the plans at issue are based on his professional experience as an architect and not on any purported expertise on copyright law. As a qualified and experienced architect, Plaintiff contends Kester employed a reliable methodology by conducting a side-by-side visual comparison of the plans and architectural drawings when reaching his opinions about the similarities between the plans. As the architect responsible for creating the plans that are the subject of Plaintiff's infringement claims, Plaintiff asserts that Kester is "a percipient expert who was not specially retained to provide expert testimony" and is therefore not subject to the expert report requirements of Rule 26(b). (Pl.'s Resp. Mot. Exclude at 3–9.) Finally, Plaintiff contends that Kester was identified as an expert on damages only out of an abundance of caution, concedes that Kester's method of totaling invoices and receipts of Defendant's profits does not require an

expert,[7] and that Kester may still testify about damages in his capacity as the Plaintiff and as a lay witness pursuant to Fed. R. Evid. 701.

## A. Legal Standard

 Federal Rule of Evidence 702 governs expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. District courts have broad discretion to determine the admissibility of expert evidence under Federal Rule of Evidence 702. *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court imposed on the trial courts a special gatekeeper role of ensuring that proffered expert testimony is both relevant and reliable before being admitted as evidence. 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). The inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

Under Rule 702, the trial court must consider whether the expert witness is qualified to opine as he does, whether his testimony is reliable, and whether his testimony is helpful to the trier of fact. More specifically, "[t]rial courts must consider whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

 The Court's objective under *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *accord Frazier*, 387 F.3d at 1260. The district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999). The Eleventh Circuit has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (quoting *Daubert*,

---

**7.** For this reason, Defendant's Motion to Exclude "expert" testimony from Kester on

gross revenues and lost profits is **GRANTED**.

509 U.S. at 593, 113 S.Ct. 2786). While *Daubert* and its progeny provide flexible guidelines for the admissibility of evidence under Rule 702, "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances of a specific case. *United States v. Brown*, 415 F.3d 1257, 1266–68 (11th Cir. 2005); *see also U.S. v. Scott*, 403 Fed.Appx. 392, 397 (11th Cir. 2010) (finding that the *Daubert* factors are only general guidelines and the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable") (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Quiet Tech. D C–8, Inc. v. Hurel–Dubois UK Ltd*, 326 F.3d 1333, 1341 (11th Cir. 2003) (finding that the court should consider the *Daubert* factors "to the extent possible" but that "these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis").

■ For example, experts may be qualified in various ways. "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61. Indeed, Federal Rule of Evidence 702 provides that expert status may be based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony. . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Thus, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas de*

*Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

**B. Kester's Designation as a Rule 26(a)(2)(C) Expert**

■ As an initial matter (and dealing with Defendant's last argument first) the Court finds that Plaintiff did not improperly designate Larry Kester as a Rule 26(a)(2)(C) expert for whom no expert report is required under Rule 26(a)(2)(B). "[I]f the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," Rule 26(a)(2)(B) requires the expert disclosure be accompanied by a detailed written report. In contrast, when disclosing the identities of other expert witnesses—those not specially retained or employed to give testimony—a party need only disclose: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Larry Kester was not "retained or specially employed to provide expert testimony in the case," nor does his position as the principal of Architects Collective "regularly involve giving expert testimony." Rather, Kester is more akin to a "percipient witness" under Rule 26(a)(2)(C) or a lay opinion witness under Fed. R. Evid. 701 because he has firsthand knowledge of the facts of the case and his testimony regarding the similarity of the plans is based on his specialized and particularized knowledge garnered from his years of experience as an architect designing his own architectural plans. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213 (11th Cir. 2003) (lay witness testimony of employees and/or

officers of company "based upon their particularized knowledge garnered from years of experience within the field"); *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-CV-01094-JEC, 2013 WL 1189493, at *10–12 (N.D. Ga. Mar. 21, 2013) (differentiating between Rule 26(a)(2)(B) and Rule 26(a)(2)(C) disclosure and report requirements as hinging on whether scope of treating physician's testimony was based on observations during course of treatment or based on facts gathered outside the course of treatment); *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (analyzing distinction between an expert who falls under Rule 26(a)(2)(B) from an expert who falls under Rule 26(a)(2)(C) in the context of the example of a "treating physician" and stating, "to give the phrase 'retained or specially employed' any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony").

Larry Kester is a proper Rule 26(a)(2)(C) witness because his opinion arises "from his ground-level involvement in the events giving rise to the litigation," and not because of his "enlistment" as an expert. *See Downey*, 633 F.3d at 6. His testimony is based on his direct personal knowledge and familiarity with his own copyrighted plans and Defendant's plans. And his involvement in the events giving rise to the litigation—his design of the plans at issue and the discovery of the alleged infringement by Defendant—renders Kester a percipient witness. As a result, he is not required to submit a Rule 26 expert report and his disclosures comply with Rule 26(a)(2)(C)(ii)'s requirement that he provide a summary of the facts and the opinions on which he intended to testify.

## C. Kester's Opinions Regarding the Similarity and Dissimilarity Between Plaintiff and Defendant's Architectural Plans

██ Plaintiff and Defendant disagree on the role and purpose of Kester's testimony. While Defendant does not dispute that Kester is a qualified and experienced architect, Defendant argues that Kester "purports to offer opinions concerning a key point of copyright law ... whether the allegedly infringing works are 'substantially similar' or 'strikingly similar' to Architects Collective's plans." (Def.'s Mot. Exclude at 5.) Examples of Kester's opinions that Defendant takes issue with include:

d. The kitchens of the Pucciano & English dwelling units B2/C1 include a window, which is strikingly, substantially similar to the kitchen window that is included in the Architects Collective dwelling units B2/C2.

e. The arrangement of the appliances of the Pucciano & English dwelling units B2/C1/A4 are substantially similar to the arrangement of the appliances in the Architects Collective dwelling units B2/C2/A1.

(Pl.'s Suppl. Disclosure of Expert Testimony at 7.)

Defendant argues that Kester "is not a practicing attorney and has no formal legal training whatsoever," and is therefore unqualified to offer such opinions. (Def.'s Mot. Exclude at 5.) Defendant also seeks to exclude Kester's expert testimony because Kester made statements about copyright case law and copyright standards in his expert deposition. (Def.'s Mot. Exclude at 6.)

In response, Plaintiff asserts that it is not offering Kester as an expert on copyright law and that the purpose of Kester's testimony is not to provide "a legal opinion or conclusion as to the similarities or differences between the two plans," but that

he was "merely explaining in what ways he had become aware of how architectural plans can be copyrighted" in his expert deposition. (Pl.'s Resp. at 9.) Instead, the purpose of Kester's testimony is to determine and analyze the individual elements and overall design similarities between the two plans and compare the various details and similarities between the architectural works. (*Id.* at 12–13.)

 While an expert may testify as to his opinion on an ultimate issue of fact, he may not provide legal opinions on the ultimate issues in this case or simply tell the jury what result to reach. *Montgomery*, 898 F.2d at 1541 (citing Fed. R. Evid. 704, committee notes (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony)); *Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F.Supp.2d 1231 (N.D. Ala. 2013) (finding that expert testimony by architect as to whether two works have meaningful architectural similarities was appropriate under *Daubert*). An expert may not testify regarding the legal implications of conduct because the court must be the only source of law. *Montgomery*, 898 F.2d at 1541; *see also Plantation Pipeline Co. v. Cont'l Cas. Co.*, 1:0–CV–2811–WBH, 2008 WL 4737163 (N.D. Ga. July 31, 2008) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) which held that "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.")); *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988) ("We do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.").

As Plaintiff appears to concede that Kester is not qualified to offer legal analysis pertaining to copyright law and its applicability to the plans at issue, the Court **GRANTS** Defendant's Motion to Exclude Expert Testimony on that basis. *Jeff Benton Homes*, 929 F.Supp.2d 1231 (N.D. Ala. 2013); *see also Home Design Services, Inc. v. Trumble*, No. 09-CV-00964, 2011 WL 1638910 (D. Colo. April 29, 2011) (finding that while expert testimony by architect is admissible to show probative similarity between two works, he could not "offer his ultimate conclusion that taken as a whole, the two works are substantially similar"). Thus, Kester will not be permitted to testify as to the ultimate issue in the case—whether the allegedly infringing plans are "substantially similar" to Architects Collective's plans.

 The Court disagrees with Defendant, however, that Kester cannot offer his comparison of the two sets of plans and identify both common factors and differences in order to assist the trier of fact in deciphering the similarity or dissimilarity of the plans at issue for purposes of determining whether infringement has occurred. *Jeff Benton Homes*, 929 F.Supp.2d 1231, 1243–44 (N.D. Ala. 2013) (denying motion to disqualify architect from testifying as an expert witness for the purpose of evaluating the similarities and differences between plaintiff and defendants' floor plans); *Home Design Servs.*, 2011 WL 1638910, at *5 (holding that architect's expert testimony discussing the architectural similarities and dissimilarities between the two plans was admissible because it showed the probative similarity between two works); *The Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, No. 3:09-CV-358, 2010 WL 2653373, at *3 (E.D.Va. July 2, 2010) (holding that "a licensed architect with extensive experience reviewing architectural drawings is qualified to

give expert testimony as to whether two different sets of architectural drawings contain meaningful architectural similarities" and reasoning that expert's thirty years of architectural experience provided him with "the basis for knowledge, skill, or experience exceeding that of the average" lay observer). Kester's analysis of the overall design similarities and his point by point comparison of individual design elements is reliable because it is based upon his extensive professional experience, as applied to the particular works at issue in this case, and will clearly assist the trier of fact in identifying potential commonalities and differences between the plans. *E.g., Jeff Benton Homes*, 929 F.Supp.2d at 1243–44 (finding expert's testimony regarding similarities and differences sufficiently reliable based on years of professional architectural experience and would assist in making determination of whether the works are substantially similar for purposes of copyright infringement); *Trumble*, 2011 WL 1638910, at *5 (finding expert report that included a list of the similarities and differences between two house plans in question would assist the trier of fact; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (stating that an expert may draw a conclusion from a set of observations based on extensive and specialized experience).

As the Court has determined that Kester is not permitted to offer expert testimony that encompasses the "ultimate issue of substantial similarity," any references in his disclosures regarding the "substantial similarity" of the particular elements and the overall designs will be stricken, and the Court will not consider any such testimony when ruling on the motion for summary judgment. Instead, the Court will form its own conclusions about substantial similarity based on the totality of the evidence, including Defendant's expert report, Kester's expert disclosures, and a review of the plans themselves in the context of controlling Circuit precedent.

Accordingly, for these reasons, Defendant's Motion to Exclude the Expert Testimony of Larry Kester [Doc. 81] is **GRANTED IN PART** and **DENIED IN PART.**

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 82]

#### A. Standard of Review on Summary Judgment

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-mov-

ing party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## B. Copyright Infringement

 To establish a prima facie case of copyright infringement, a plaintiff must prove (1) that it owns a valid copyright in the work allegedly infringed, and (2) that the defendant copied protected elements of that work. *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008); *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 903–04 (11th Cir. 1986); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 824 (11th Cir. 1982).

### 1. Ownership of a valid copyright

The first element—ownership of a copyright—may be demonstrated through registration with the Copyright Office pursuant to 17 U.S.C. § 411; *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d at 903. The grant of copyright protection by the Copyright Office, evidenced by certificates of registration "constitute[s] *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," including the requirement of originality. *Id.* (citing 17 U.S.C. § 410(c) and *Nimmer on Copyright* § 13.01[A], at 13–4). "The burden then shifts to the defendants to rebut this presumption of validity." *Id.*

 A certificate of registration is sufficient evidence of ownership of a valid copyright "regardless of whether the certificate contains any inaccurate information, unless ... (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." *St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1201 (11th Cir. 2009) (quoting 17 U.S.C. § 411(b)); *see also Dream Custom Homes, Inc. v. Modern Day Const., Inc.*, 773 F.Supp.2d 1288, 1302 (M.D. Fla. 2011), *aff'd*, 476 Fed.Appx. 190 (11th Cir. 2012) ("A party may overcome the presumption of validity by providing proof of deliberate misrepresentation. A material misstatement in a copyright registration application is one which goes toward the registrability of the materials, such as originality, the nature of the materials to be copyrighted, and contested claims of authorship and ownership.") "Omissions or misrepresentations in a copyright application can render the registration invalid where there has been intentional or purposeful concealment of relevant information." *St. Luke's Cataract & Laser Inst.*, 573 F.3d at 1201 (internal quotations omitted); *Original Appalachian Artworks, Inc.*, 684 F.2d at 828. "Thus, there must be a showing of 'scienter' in order to invalidate a copyright registration." *St. Luke's Cataract & Laser Inst.*, 573 F.3d at 1201. "In general, an error is immaterial if its discovery is not likely to have led the Copyright Office to refuse the application." *Id.*

 Defendant challenges the validity of Plaintiff's copyright registrations based on Kester's testimony that:

(1) he is not the sole author of the plans for which he sought and obtained copyright registration; (2) he did not disclose any additional authors on his copyright application; (3) the plans for which he sought and obtained copyright registration are derivative works based on his

prior designs, some of which were protected by copyright, and some of which were not; and (4) he did not disclose the derivative nature of the works to the Copyright Office.

(Def.'s Br. Supp. Mot. at 10–11.) There are several problems with Defendant's argument. First, Defendant has mischaracterized Kester's deposition testimony. Second, Defendant has relied on facts stated only in its brief and not set forth in a separate statement of material facts as required. *See* LR 56.1(B)(1)(d) ("The court will not consider any fact: ... set out only in the brief and not in the movant's statement of undisputed facts."); *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) ("Local Rule 56.1 protects judicial resources by "mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge [and] streamlines the resolution of summary judgment motions by focus[ing] the district court's attention on what is, and what is not, genuinely controverted.") (citations omitted). And third, Defendant's assertions regarding authorship and derivative works are entirely conclusory and are not supported by even a single citation to legal authority to substantiate the claim that Kester's registration contained material misrepresentations that would have impacted the Copyright Office's decision as to the registrability of the plans.

■ Defendant asserts that Plaintiff's copyright registrations are invalid in light of Kester's testimony "that he intentionally failed to disclose additional *authors* that provided design services" on his developments for Crowne Partners. (Def.'s Br. Supp. Mot. at 11) (emphasis added). As Kester's deposition testimony illustrates, Kester disputed any implication by Defendant that he was not the author of the architectural plans solely by virtue of the work of some of his employees related to site plans—as opposed to the design of individual apartment units. (Kester Dep. at

105, 111–12.) The only undisputed facts properly before the Court are that: (1) "Kester certified on the copyright application for each project that he was the sole author of each work," (Def.'s SMF ¶ 9; Pl.'s Resp. SMF ¶ 9 ("Admitted.")), and (2) "Kester did not notify the Copyright Office or otherwise indicate on the copyright applications that other individuals provided design services for each project," (Def.'s SMF ¶ 10; Pl.'s Resp. SMF ¶ 10 ("Admitted.")). Defendant has offered no authority that would support a finding that other employees of Architects Collective qualify as authors of the plans for which Architects Collective received copyright registration and that by not listing them as such, all of Plaintiff's copyright registrations are invalidated. Rather,

> Under the Copyright Act, the author of a work is the initial owner of the copyright for that work. 17 U.S.C. § 201(a). When a work is "made for hire," the employer, rather than the employee, is deemed the author. 17 U.S.C. § 201(b). Any work prepared by an employee within the scope of his or her employment qualifies as a work for hire. The employer is the author of that work and thus the owner of the copyright. *See Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

*LaJoie v. Pavcon, Inc.*, 146 F.Supp.2d 1240, 1248, n.5 (M.D. Fla. 2000); 17 U.S.C. § 201(b) (stating "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"); 17 U.S.C. § 101 (defining a "work made for hire" as "a work prepared by an employee within the scope of his or her employment"). Thus, the Court finds that Defendant has

failed to satisfy its burden of demonstrating the invalidity of Plaintiff's copyright registration based on purported (but unsubstantiated) material misrepresentations regarding authorship.

Defendant further contends that Plaintiff's copyright registrations are invalid in light of Kester's testimony that he did not disclose that the works were derivative of earlier works. A review of the deposition pages cited only in Defendant's brief[8] indicates that Kester did not offer testimony that architectural plans for which he sought and was granted copyright registration were "derivative" of other prior work. Plaintiff argues in response that Architects Collective's floorplans are not "derivative works[9]" for purposes of copyright registration because they are based entirely on Kester's original designs. "The exclusive rights of a copyright owner include the right to prepare and to authorize others to prepare 'derivative works based upon the copyrighted work.'" *Peter Letterese And Associates, Inc. v. World Inst. Of Scientology Enterprises*, 533 F.3d 1287, 1297, n.9 (11th Cir. 2008) (quoting 17 U.S.C. § 106(2)).

 Even if Kester's plans constitute "derivative works" under the Copyright Act, Plaintiff is correct that a failure to list a design as a pre-existing work in subsequent copyright applications does not affect the validity of the copyright for the subsequent applications. *E.g., Donald Frederick Evans and Assocs.*, 785 F.2d at 904 (holding that "although Evans failed to list the Starshine as a pre-existing work on the Sunridge copyright registration application, this omission does not invalidate the registration because the defendants did not offer any evidence to prove Evans' omission was intentional or purposeful. Without proof of the scienter element, the claim fails."). The Copyright Act requires that a registration application include "in the case of a compilation or derivative work, an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). "Because a derivative work is only copyrightable to the extent that it is original, 17 U.S.C. § 103(b), it is important that the Copyright Office be informed of the preexisting work so that it may determine if the author of the derivative work has made an original contribution." *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F.Supp.2d 1, 23 (S.D.N.Y. 2001), *aff'd in part and remanded*, 277 F.3d 253 (2d Cir. 2002). "In general, failure to disclose that the registered work is derivative of an earlier, underlying work should occasion rejection of the registration certificate only if the claimant was for some reason ineligible to

8. Defendants do not rely on any deposition testimony by Larry Kester in support of a separate statement of material fact as to this contention. As a result, these "facts" are included only in Defendant's brief and the Court is free to disregard them pursuant to LR 56.1(B)(1)(d), though the Court has, in actuality, fully considered Defendant's argument here.

9. "[T]he term derivative work in a technical sense does not refer to all works that borrow in any degree from pre-existing works. A work is not derivative unless it has *substantially* copied from a prior work. If what is borrowed consists merely of ideas and not of the expression of ideas, then, although the work may have in part been derived from prior works, it is not a derivative work. Put another way, a work will be considered a derivative work only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work. It is saved from being an infringing work only because the borrowed or copied material was taken with the consent of the copyright owner of the prior work...." *Nimmer on Copyright* § 3.01 (2015).

register the derivative work." *Nimmer on Copyright* § 7.20 (2015); *see also Nimmer on Copyright* § 3.01 (stating that "a work will be considered a derivative work only if it would be considered an infringing work" if it were unauthorized). An author does not infringe his own work. Thus, when the author of the work for which registration is sought is also the author of the preexisting work, there is no basis to doubt his eligibility to register the subsequent work for copyright protection. For these reasons, the Court finds that Defendant has failed to satisfy its burden of rebutting the presumption of validity as to Plaintiff's copyright registration because Defendant has not demonstrated either (a) that the plans were derivative works, (b) that Kester's alleged failure to disclose that the plans were derivative works was made with the purpose of concealing information regarding originality of the plans, or (c) that the Copyright Office's discovery of Kester's alleged failure to indicate on the copyright applications that the plans for each project were derivative of his prior works would have likely led the Copyright Office to refuse the application.

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment on the ground that the Plaintiff's copyrights were not properly registered.

### 2. Defendant's access to Plaintiff's protected work

■ The second element of a plaintiff's prima facie case—copying by the defendant—can be proven by direct evidence or circumstantial evidence. *Donald Frederick Evans and Assocs., Inc.*, 785 F.2d at 904. "Since it is virtually impossible to prove copying directly, this element is usually established circumstantially, by demonstrating that the person who composed the defendant's work had access to the copyrighted material and that there is substantial similarity between the two works." *Herzog v. Castle Rock Entm't*, 193 F.3d

1241, 1249 (11th Cir. 1999); *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 825 F.3d 1314, 1321 (11th Cir. 2016). "Just as it is virtually impossible to offer direct proof of copying, so is it often impossible for a plaintiff to offer direct evidence that defendant actually viewed or had knowledge of plaintiff's work." *Herzog*, 193 F.3d at 1249.

While some courts have defined access as the actual viewing and knowledge of plaintiff's work by the defendant, the Eleventh Circuit regards a "reasonable opportunity to view" as access. *Id.* (citing *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978)). Despite this more relaxed standard, access to a copyrighted work may not be inferred through mere speculation or conjecture; there must be a reasonable possibility of viewing a plaintiff's work, not a bare possibility. *Id.* at 1241 (citing *Nimmer on Copyright* § 13.02[A] ).

But, "evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by defendant." *Nimmer on Copyright* § 13.02 (2017); *cf. Herzog*, 193 F.3d at 1250–51 (concluding that the Plaintiff's allegations of Defendants' access to her screenplay were too speculative and attenuated where neither Plaintiff (film student) nor Defendants (movie screenwriter and producers) were doing business with either film critic "who was not a conduit for the film industry" or members of the Plaintiff's thesis committee who played no role in production of alleged infringing work); *see also Kamar Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059 (9th Cir. 1981); *Arthur Rutenberg Corp. v. Parrino*, 664 F.Supp. 479, 481 (M.D. Fla. 1987) (finding in infringement action by architecture firm against homeowner and homeowner's drafting firm that homeowner's access to the Plaintiff's architectural plans was fairly attributable

to the drafting firm because "evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiffs' work is sufficient to establish access by the defendant").

■ Here, the evidence on summary judgment shows that Crowne Partners, the mutual client of Architects Collective and Pucciano & English for whom the architectural plans at issue were designed by both parties, had physical copies of Architects Collective's plans. The record further demonstrates that Crowne Partner's principal, Alan Levow, asked one of his employees to forward Architects Collective's plans to Pucciano & English and that an architect working with Pucciano & English at Levow's insistence requested copies of those plans because she had no experience designing apartments. Despite the denials by both Crowne Partners and Pucciano & English that no plans were in fact ever shared, Plaintiff is entitled to an inference that Defendant had a "reasonable opportunity to view" the Architects Collective plans by virtue of its direct relationship with Crowne Partners. *Nimmer on Copyright* § 13.02 (2017); *Herzog*, 193 F.3d at 1250–51; *Arthur Rutenberg Corp.*, 664 F.Supp. at 481.

"[I]t is clear that, even if evidence is unavailable to demonstrate actual viewing, proof that the defendant had the opportunity to view (when combined with probative similarity) is sufficient ... in other words, the factfinder has the discretion to reject even the uncontradicted testimony of the writer of defendant's work that he had never in fact viewed plaintiff's work." *Nimmer on Copyright* § 13.02 (2017); *see also Smith v. Little, Brown & Co.*, 245 F.Supp. 451 (S.D.N.Y. 1965), *aff'd*, 360 F.2d 928 (2d Cir. 1966); *De Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944), *cert. denied*, 325 U.S. 862, 65 S.Ct. 1197, 1198, 89 L.Ed. 1983 (1945); *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946). Accordingly, the Court finds that the question of whether Defendant had access to Plaintiff's copyrighted plans is a factual matter which cannot be resolved in Defendant's favor on summary judgment. As there remains a genuine issue of material fact whether Defendant did or did not have access to Plaintiff's plans, the Court **DENIES** Defendant's Motion for Summary Judgment as to this element of Plaintiff's infringement claim.

### 3. Substantial Similarity Between the Plans

■ Regardless of how copying is proved, Plaintiff must also establish that the alleged infringing work is substantially similar to Plaintiff's work.[10] Defendant

---

10. As noted above, a plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are "substantially similar." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008) (noting that where disputed issues of fact are found to exist as to whether certain defendants had access to the plaintiff's designs, summary judgment turned on the issue of substantial similarity). But, "[i]f the plaintiff cannot demonstrate access, he or she still may establish copying by showing that the works are 'strikingly similar.'" *Id.* at 1223–24, n.4 (citing *Corwin*, 475 F.3d at 1253. "Striking similarity exists where the proof of similarity in appearance is 'so striking that the possibilities of independent creation, coincidence and prior

common source are, as a practical matter, precluded.'" *Corwin*, 475 F.3d at 1253 (quoting *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984)). On the other hand, and as discussed herein, substantial similarity is defined by the courts as existing "where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," focusing on "similarity of expression, i.e., material susceptible of copyright protection." *Oravec*, 527 F.3d at 1224 (citing *Original Appalachian Artworks*, 684 F.2d at 829, *Beal*, 20 F.3d at 459 and *Herzog*, 193 F.3d at 1247). Based on the Court's analysis in Section 2 above, it finds for purposes of Defendant's summary judgment motion that

seeks summary judgment on the ground that Pucciano & English's A4/B2/C1 unit plans are not substantially similar to Architects Collective's A1/B2/C2.2 unit plans.

The Copyright Act defines "architectural work" as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design." 17 U.S.C. § 101. At the same time, however, "the Copyright Act restricts which elements of architectural floor plans are protectable" by excluding "individual standard features" from the protectable elements of the design. *Home Design Servs.*, 825 F.3d at 1321 (citing 17 U.S.C. § 101). According to the Act's legislative history, "individual standard features" include "common windows, doors, and other staple building components." H.R.Rep. No. 101–735 (1990), as reprinted in 1990 U.S.C.C.A.N. 6935, 6949; *see also Oravec*, 527 F.3d at 1225 (citing legislative history); *Home Design Servs.*, 825 F.3d at 1321 (same). This definition reflects Congress's awareness that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectable elements into an original, protectable whole." H.R.Rep. No. 101–735, as reprinted in 1990 U.S.C.C.A.N. at 6949.

■■■ "While individual standard features and architectural elements classifiable as ideas are not themselves copyrightable, an architect's original combination or arrangement of such features may be." *Oravec*, 527 F.3d at 1225 (citing *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1251 (11th Cir.2007) ("[A] work may be protected by copyright law when its otherwise unprotectable elements are arranged in a unique way.")) Thus, both the individual design elements and the unique compilation of the substantially similar standard—not the

those elements are relevant to the copyright infringement analysis. *Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F.Supp.2d 1231, 1241 (N.D. Ala. 2013).

■■■ Substantial similarity exists where "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 920 (11th Cir. 2008) (quoting *Original Appalachian Artworks, Inc.*, 684 F.2d at 829); *Oravec*, 527 F.3d 1218, 1224 (11th Cir. 2008). But, "not every nook and cranny of an architectural floor plan enjoys copyright protection." *Home Design Servs.*, 825 F.3d at 1321. And "not all copying constitutes infringement." *Oravec*, 527 F.3d at 1224 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The Eleventh Circuit has likened the statutory definition of "architectural work" to that of a "compilation," and afforded architectural works "thinner" copyright protection than other creative works. *Intervest*, 554 F.3d at 919–920, n.3; *Home Design Servs.*, 825 F.3d at 1321. The author's choices as to selection coordination, or arrangement are the only portions of an architectural work that are entitled to copyright protection. *Intervest*, 554 F.3d at 919. Thus, "the substantial similarity analysis "must focus on similarity of expression, i.e., material susceptible of copyright protection." *Oravec*, 527 F.3d at 1224 (citing *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459, n. 4 (11th Cir. 1994) and *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (stating that a copyright plaintiff "must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work *with regard to its protected elements*")). The plaintiff must demonstrate both that "the similarities be-

striking similar standard—applies.

tween the works are substantial from the point of view of the lay observer" and that "those similarities involve copyrightable material." *Id.* (quoting *Herzog*, 193 F.3d at 1248). In other words, the "substantial similarity" must exist at "the level of protected expression—that is, the arrangement and coordination of those common elements ('selected' by the market place, i.e., rooms, windows, doors, and "other staple building components')." *Intervest*, 554 F.3d at 919–921; *Oravec*, 527 F.3d at 1227.

■■■■ Historically, courts have been reluctant to make subjective determinations in copyright cases regarding the similarity between two works on summary judgment. *Herzog*, 193 F.3d at 1247. However, a court may make a finding of non-infringement as a matter of law on summary judgment if the similarity between the works concerns only non-copyrightable elements, or if no reasonable jury, properly instructed, would find as to the protectable elements that the two works are substantially similar. *Id.* (citing *Beal*, 20 F.3d at 459); *Intervest*, 554 F.3d at 920; *Home Design Servs.*, 825 F.3d at 1321 (standing by the "core premise that judges can, in certain cases, remove the question of substantial similarity from jury consideration"). In fact, the *Intervest* Court held that judges are generally better able to conduct this inquiry at summary judgment than jurors are at trial, especially as to claims of architectural infringement involving compilations of non-original elements. *Intervest*, 554 F.3d at 920. This is so, *Intervest* instructs, because

when the crucial question in a dispute involving compilations [such as architectural works] is substantial similarity at

the level of protectable expression, ... a judge is better able to separate original expression from the non-original elements of a work where the copying of the latter is not protectable and the copying of the former is protectable ... a judge will more readily understand that all copying is not infringement, particularly in the context of works that are compilations [and] the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact.

*Id.*[11]

■■■■ The Eleventh Circuit has held that "modest dissimilarities" are significant when comparing architectural works, due to the fact that "there are only a limited number of ways" to organize a rectangle into an interior floor plan with standard architectural features including the placement of a kitchen, living room, bedrooms, bathrooms, and closets. *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1326 (11th Cir. 2012); *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992); *Home Design Servs. v. David Weekley Homes, LLC*, 548 F.Supp.2d 1306, 1313 (M.D.Fla.2008) ("there are only a finite number of ways a rectangle can be divided into bedrooms, baths, kitchen, living room, closets and so on."). As a result, "similarities in the general layout of rooms can easily occur innocently," and the fact that the floor plans at issue are similar in their overall layout is not dispositive. *Miller's Ale House*, 702 F.3d at 1326; *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 101 F.Supp.3d 1201, 1214–15 (N.D. Fla. 2015),

11. While this Court does not necessarily agree with *Intervest*'s construction of the infringement standard for architectural works on summary judgment, for the precise reasons laid out by Judge Rosenbaum in her concurrence in *Home Design Servs., Inc. v. Turner*

*Heritage Homes, Inc.*, the Court is bound to follow *Intervest* in undertaking its analysis in this case. *See Home Design Servs.*, 825 F.3d at 1327–33 (11th Cir. 2016) (Rosenbaum, concurring).

*aff'd*, 825 F.3d 1314 (11th Cir. 2016). Thus, any differences between two floor plans "would weigh heavily against a finding of substantial similarity." *Miller's Ale House*, 702 F.3d at 1326 (quoting *Oravec*, 527 F.3d at 1227); *Home Design Servs*, 825 F.3d at 1324; *Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F.Supp.2d 1231, 1252 (N.D. Ala. 2013).

In *Intervest*, the Court examined a set of architectural house plans, and found that although the plans shared the same overall layout, the layout was not copyrightable and the plans were not substantially similar as a matter of law due to numerous, subtle differences in the plans' otherwise standard architectural features. *See Intervest*, 554 F.3d at 916–18, 921 (describing the common elements across the two floor plans at issue as four bedrooms, a two-car garage, living room, dining room, family room, foyer, kitchen, two bathrooms, a nook, and a porch, but finding that no reasonable jury could find the two floor plans at issue "substantially similar," even though they each had a similar overall layout of rooms and living spaces). The Eleventh Circuit has twice held that because a general layout is not copyrightable, where floor plans differ in terms of "dimensions, wall placement, and the presence[,] arrangement [and function] of particular features (or use of slightly varied features)," the similarities in the plans concern only their noncopyrightable elements and thus preclude a finding of infringement. *See id.*; *see also Home Design Servs.*, 825 F.3d at 1324–25 (finding no infringement despite the plans sharing in common the same set of rooms, arranged in the same overall layout, the same presence, location, and function of walls, entryways, windows, and fixtures because there was nothing unusual in the plaintiff's design choices and "[n]o one, including [plaintiff], owns a copyright to the idea of a four-three split style, nor to the industry standards that architects regularly heed to achieve such a split").

## C. Plan Comparisons

 Plaintiff contends that the architectural designs of Architects Collective's A4/B2/C2 unit plans and Pucciano & English's A1/B2/C1 unit plans have the same "overall form, look and feel of the dwelling units" and the same "overall layout of primary spaces and certain secondary spaces of the dwelling units." (Ex. L to Pl.'s Resp., Doc. 90–12 at 6–11; Ex. N to Pl.'s Resp., Doc. 90–14 ¶¶ 57–58.) Plaintiff argues that "any layperson can readily see that it was not mere coincidence" that the One Bedroom (A) Unit plans, Two Bedroom (B) Unit plans, and Three Bedroom (C) Unit plans "all were designed with the same layouts, amenities, wall sections, angles, and mechanical and plumbing details."[12] (Pl.'s Resp. at 23.) Though "[m]inor differences exist," Plaintiff asserts "the overwhelming similarities negate mere cosmic chance of similarity." (*Id.*) As examples, Plaintiff points out:

> Defendant's two-bedroom units (B2) share the exact same placement as the plans of Plaintiff of: the entryway, kitchen, stove, kitchen sick, double vanity in the master bath, two bathrooms in same location, balcony in same location, all the mechanical, electrical, and plumbing (M.E.P.) in same areas, living room

---

**12.** Plaintiff also asserts that "[m]ost telling i[s] the Defendant's plans use the exact same technical detail drawings for the fire sprinkler piping and insulation, the exact same flashing detail design, the same trim band design, and a near identical copy of sink detail drawings. (*See* Exhibit 4, technical detail drawings.)

These are tell-tale features that are intrinsically unique to Architects Collective's plans that were drawn almost four years prior to those of Defendant." (Pl.'s Resp. at 23.) The Court, in the absence of expert guidance, is unable to draw any unequivocal conclusions from the technical detail drawings.

in same area, along with the same placement of both bedrooms. *See* Exhibit 5, Deposition of Butch Rigsby p. 40, lines 18–25, pgs. 41–57, pg. 85, lines 1–23. For the three-bedroom units (C units) the plans share the exact same placement of: master bedroom, dining room, balcony, living room, kitchen, the range, kitchen sick, refrigerator, and entryway. *See* Exhibit 5, deposition of Butch Rigsby p. 40, lines 18–25, pgs. 41–57, pg. 85, lines 1–23.

The same multitude of similarities exist for the one-bedroom unit (A units) with: the same placement of bedroom, closet, bathroom, balcony, kitchen, entryway, and interior walls. *See* Exhibit 5, deposition of Butch Rigsby p. 40, lines 18–25, pgs. 41–57, pg. 85, lines 1–23. *See also*, Document 81.2, pages 6–10.

(*Id.* at 23–24.) Plaintiff offers side-by-side comparisons of the unit plans as evidence of the overwhelming similarities of the units and as proof that its plans were copied by Defendant.

Defendant retained an expert, Robert Koch, to undertake an examination of Architects Collective and Pucciano & English's unit plans for originality. Mr. Koch understands Plaintiff's claim to be that the "individual unit floor plans produced by AC [Architects Collective] are incrementally and in their entirety protected work product." (Ex. D, Koch Report, Doc. 82–5 at 15.) Mr. Koch notes that in considering the space/function relationships that guide floor plan design, "[s]pace arrangements may occasionally differ from standard industry convention[.] However, most space arrangements are dictated by industry standards[.]" (*Id.* at 11.) His report provides the following examples of unit design "dictated by common convention:"

○ Living/dining/and kitchen areas in current industry patterns are frequently arranged inio central "great room" expression.

○ Bedrooms, closets and bathrooms are grouped as a unit.

○ Exterior balconies or porches are primarily positioned as extensions of living areas.

○ Two bed/two bath units serving the adult roommate market are design as "double master/mingle" arrangements with dual split bedroom suites accessed off remote portions of a central living area.

○ Three bed units serving the family market prefer split plans with secondary bedrooms and bath on opposite sides of main living area from master suite.

○ Units located on ends and corners of buildings favor living areas located on the corner with windows facing two directions. Bedroom/bathroom suites resultantly are located on sides adjoining neighboring units or exit assemblies.

(*Id.*)

In his comparison of the unit plans, Koch first separated the elements of the comparative designs that are the product of industry standards and then afforded specific attention to the elements of the design that differed one from the other. (*Id.* at 13.) Koch found that "[w]hile there are a number of standard features and elements found in both the copyrighted [Architects Collective] works and the Defendant's works that reflect pre-established industry standards, pre-established market preferences, and pre-defined code and regulatory mandates, there are a significant number of distinctions between the [Architects Collective] copyrighted works and the Defendant's unit floor plans." (*Id.* at 16.) In concluding his detailed comparison of both Plaintiff and Defendant's floor plans, Koch noted "an extensive listing of deviations suggesting strongly independent thought in the organization of each plan." (*Id.* at 15; Koch Report Ex. D and Ex. E.)

### 1. One Bedroom (A) Units

In addition to the similarities regarding the overall form, look and feel, and the overall layout of the rooms, Larry Kester also contends that the One Bedroom Units (A1 and A4) share the following similarities: (1) kitchen arrangements and arrangement of kitchen appliances; (2) nine (9) foot ceiling heights; (3) vaulted ceilings in top floor units; (4) crown molding used in living and dining rooms; (5) location of wall mounted air handler and low boy water heater spaces; and (6) use of ceiling fans. (Ex. L to Pl.'s Resp. to Def.'s SMF, Doc. 90–12 at 6–9.) The Court notes that the version of plans provided by Kester for comparison do not indicate details such as ceiling height or type, crown molding, or ceiling fans. In his report, Koch states that several interior design related decisions are not included on the unit plans, such as interior elevations of key dwelling features, millwork, and various other significant feature/detail choices are not indicated in the registered Architects Collective designs. (Doc. 82–5 at 15.) In any event, the use in both plans of individual standard features such as nine (9) foot ceilings, vaulted ceilings, crown molding, and ceiling fans is too common to warrant copyright protection. *E.g., Miller's Ale House*, 702 F.3d at 1326. And according to Mr. Koch, the common U-shaped kitchen layout used in both Architects Collective and Pucciano & English's plans is a standard layout under applicable housing regulations.

Although Plaintiff "disputes" Koch's opinion that the units reflect a standard arrangement of the primary and secondary living spaces in common use in the multi-family industry, Plaintiff has failed to carry its burden by presenting evidence that would raise a genuine issue of material fact on this issue.[13] In purporting to dispute that certain design decisions are dictated by industry standards, Plaintiff asserts "[t]here is no standard arrangement of spaces as an architect is only limited by his own creativity. Even if there were certain standards, the architect would still have ample opportunities to create an original, copyrightable floor plan via independent creation." (Pl.'s Resp. Def.'s SMF ¶ 7.) Plaintiff relies exclusively on the following testimony from Larry Kester's expert deposition:

> I can't tell you how many projects we worked on that are—and uniquely different than anything else. Some of them were really in awful stuff, but they're still different designs. And in that process we've taken those projects and walked them and looked at them and became familiar with them. There's hundreds of them we've renovated that are different than anything else that we're seeing in Robert Koch's report as an industry standards.
>
> . . .
>
> There's two ways to look at it. One is there's a lot of ways to arrange a dwelling unit. It's just a matter of how much time you're willing to spend to figure out

---

**13.** If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is accepted and all reasonable inferences are drawn in his favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. *Samples ex rel. Samples v. City of* *Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982).

those solutions. But the other thing, which is more product of systematic method of looking at it, there's a method we refer to as permutations. You can take ten individual characters one, two, three, four, whatever, or alpha characters, put them together. There's a set mathematical equation that allows you to calculate how many different combinations you can rearrange those ten figures. And I defy you to try it because it's proven and sometimes referred to as purple math. Purple math uses a function called factorial. So if you've got six objects you multiply one times two times three times four times five times six, and in that case you'll get 750 possible alternatives you can arrange units without rotating a room. That's just in the same room position you can arrange a unit. So the theory that you can only do so many unit layouts is not true at all.

(Kester Expert Dep. 135, 138.) The Court appreciates that Mr. Kester may be echoing the recognition under Eleventh Circuit law that there is a wide potential range of ways in which architectural features can be assembled. However, the thrust of his remarks still are directed to the assertion that basic room layout design is inherently protectable creative work—a principle rejected under controlling Eleventh Circuit precedent under most circumstances.

Nor does Plaintiff provide any evidence to counter Mr. Koch's opinion that the U-shaped kitchen layout common to both Architects Collective and Pucciano & English's plans is either standard in the industry or a standard layout that complies with the Fair Housing Act. Rather in responding to this point, Plaintiff asserts only that the Fair Housing Act "does not require a 'U' shaped kitchen," and that a U-shaped kitchen "is one of any options an architect can use when designing a kitchen." (Pl.'s Resp. SMF ¶ 93.) In support of his response, Plaintiff relies on "Exhibit D, Kester_File001431–001432," a two-page photo copy of an unidentified document regarding "Residential Kitchen Planning," showing various kitchen layouts, including a U-shaped layout, and stating "[t]he layouts shown here, together with their general area requirements, are based on studies of furniture, appliances, storage, and clearances for the average residential kitchen." (Ex. D to Pl.'s Resp. to Def.'s SMF, Doc. 90–4.) Indeed, this document appears to acknowledge that U-shaped layout is commonly found in the average residential kitchen.

More specifically, Larry Kester points to the following similarities with respect to the arrangement of protected design elements in Architects Collective's Unit A1 and Pucciano & English's Unit A4 plans:

| Kester Comparison of Similarities in Unit A4 and A1 | | |
|---|---|---|
| | Architects Collective Unit A1 | Pucciano & English Unit A4 |
| Entry Access Door | Provides for immediate access into living room (Ex. N, ¶ 106) | Provides for immediate access into living room (Ex. N, ¶ 107) |
| Entry Access Door | Left-hinged and swings into unit (Ex. N, ¶ 108) | Left-hinged and swings into unit (Ex. N, ¶ 109) |
| Refrigerator | Located directly to left of pantry (Ex. N, ¶ 112) | Located directly to left of pantry (Ex. N, ¶ 113) |
| Bathroom Vanity | Located along the left, back wall of bathroom (Ex. N, ¶ 118) | Located along the left, back wall of bathroom (Ex. N, ¶ 119) |
| Bathroom Lavatory | Located along the back wall between vanity and bathtub (Ex. N, ¶ 120) | Located along the back wall between vanity and bathtub (Ex. N, ¶ 121) |
| Bathtub | Located along right wall of bathroom (Ex. N, ¶ 122) | Located along right wall of bathroom (Ex. N, ¶ 123) |
| Bedroom Access Door | Left-hinged and swings into bedroom (Ex. N, ¶ 126) | Left-hinged and swings into bedroom (Ex. N, ¶ 126) |
| Bedroom Closet Door | Right-hinged and swings into the bedroom (Ex. N, ¶ 130) | Right-hinged and swings into the bedroom (Ex. N, ¶ 131) |

(Ex. N to Pl.'s Resp. to Def.'s SMF, Doc. 90–14 at 11–14.)

Kester's comparison also notes that: (a) the kitchens in both units are located directly off the living room, to the left side of unit when entering, (Ex. N to Pl.'s Resp. to Def.'s SMF ¶¶ 110, 111); (b) the dining areas in both units are located between living room and bedroom (Ex. N, ¶¶ 114, 115); (c) the bathrooms in both units are located directly off the dining room (Ex. N, ¶¶ 116, 117); (d) the bedrooms in both units are located on right side of dining area (Ex. N, ¶¶ 124, 125), and the bedroom closets in both units are located in upper right corner of bedroom, sharing a wall with the bathroom, (Ex. N, ¶¶ 128, 129); (e) the balcony/patio in both units abuts the living room, dining area, and bedroom, (Ex. N, ¶¶ 134, 135), and the balcony/patio access door is located in the dining area in both units, (Ex. N, ¶¶ 132, 133). But these features relate to similarities in the general floor layout of the one bedroom units, which is dictated by industry standards, and are not subject to copyright protection. *See Howard v. Sterchi*, 974 F.2d at 1272, 1276 (11th Cir. 1992) (affirming district court's holding that although the floor plans are visually similar and the layout is generally the same, the dissimilarities were significant and warranted granting summary judgment to defendant on claim of copyright infringement); *Intervest*, 554 F.3d at 916, 922 (holding that although the floor plans shared the same overall layout, the layout was not copyrightable); *Home Design Servs.*, 825 F.3d at 1325–26 (same).

Mr. Koch opined that neither the Architects Collective Unit A1 plan nor the Pucciano & English Unit A4 plan are unique to the industry standard for "one bedroom/one-bath back to back" apartment units. (Addendum # 2 to Expert Report of Robert A. Koch, AIA, Ex. R to Def.'s Mot., and Ex. K thereto, Doc. 82–12; Def.'s SMF ¶ 198.) He further found that the "unit floor plans contain significant evi-

dence of independent thought in the decisions that were implemented in each plan," and noted a number of specific "unit design dissimilarities." (*Id.*) The chart below contains the dissimilarities between Architects Collective's Unit A1 plan and Pucciano & English's Unit A4 plan, as noted by Mr. Koch, along with the Court's own observations of these features:

| Koch Comparison of Dissimilarities in Unit A1 and A4 | | | |
|---|---|---|---|
| | Architects Collective Unit A1 | Pucciano & English Unit A4 | Court's Observations |
| Entry Door | The entry door is placed on a diagonal axis, "suggesting a modeled corridor wall condition at the exit." SMF 170 (Ex. R "Koch 2nd Addendum Report", and Exhibit K thereto) | The entry door position is flush and squared for "a conventional breezeway exit condition." SMF 171 (Ex. R, and Exhibit K thereto) | The AC entry door is diagonal while the P&E entry door is flush. Unclear as to meaning of remaining description. |
| Water heater/HVAC | Located near the entry door/"exit assembly and includes a dead pocket behind it." SMF 172 (Ex. R, and Exhibit K thereto) | Located in a central location "which minimizes duct distribution lengths." SMF 173 (Ex. R, and Exhibit K thereto) | Water heater and HVAC in P&E unit is located near the center of the unit between laundry and dining room. Cannot determine accuracy of other characterization re: duct distribution. |

| Koch Comparison of Dissimilarities in Unit A1 and A4 | | | |
|---|---|---|---|
| | Architects Collective Unit A1 | Pucciano & English Unit A4 | Court's Observations |
| Kitchen | Sink is in a peninsula location, facing outward. SMF 174 (Ex. R, and Exhibit K thereto) | Sink is positioned on a party wall, facing inward. SMF 175 (Ex. R, and Exhibit K thereto) | Kitchen sinks are located in different places, but cannot determine whether sink in AC unit is outward facing or whether sink in P&E unit is inward facing. Both sinks face in toward kitchen from their respective locations on opposite sides of the kitchen. |
| Kitchen | The kitchen layout includes U-shaped cabinetry. SMF 176 (Ex. R, and Exhibit K thereto) | The kitchen layout is an island design. SMF 177 (Ex. R, and Exhibit K thereto) | The kitchen in AC plan does not include a floating "island." AC is U shaped with sink/counter open to living room, while P&E is L shaped with floating island into living room. |
| Laundry | The laundry closet is placed off of the bathroom with an opposing position design (washer and dryer facing each other on opposite walls). SMF 178 (Ex. R, and Exhibit K thereto) | The laundry closet is placed off of the kitchen with a side-by-side design (washer and dryer side-by-side). SMF 179 (Ex. R, and Exhibit K thereto) | Koch accurately describes the differences in washer/dryer setup, but note that the laundry closet in both AC and P&E plans is located between the kitchen and bathroom. |

| Koch Comparison of Dissimilarities in Unit A1 and A4 | | | |
|---|---|---|---|
| | Architects Collective Unit A1 | Pucciano & English Unit A4 | Court's Observations |
| Bathroom | Vanity is a one unit base cabinet vanity with a staggered opposing wall. SMF 180 (Ex. R, and Exhibit K thereto) | Vanity is an oversized two base cabinet vanity with a flush opposing wall. SMF 181 (Ex. R, and Exhibit K thereto) | The designs of the base cabinets and opposing walls are unclear from the plans. But it appears the P&E plan may have additional vanity space. And the doors are placed in slightly different locations. |
| Bathroom | The unit does not have a bathroom plumbing shaft. SMF 182 (Ex. R, and Exhibit K thereto) | The unit does have a bathroom plumbing shaft. SMF 183 (Ex. R, and Exhibit K thereto) | The plumbing situation is unclear; however, the wall behind P&E's plan includes space, apparently for plumbing. |
| Bathroom | Bathroom door swings outward. SMF 194 (Ex. R, and Exhibit K thereto) | Bathroom door swings inward. SMF 195 (Ex. R, and Exhibit K thereto) | Bathroom doors swing in opposite directions. |
| Bedroom | Windows have two separate sashes. SMF 184 (Ex. R, and Exhibit K thereto) | Windows have a double combined sash unit. SMF 185 (Ex. R, and Exhibit K thereto) | The AC unit has two separated windows. P&E's unit has two side-by-side windows. |
| Balcony | The balcony is shallow and wide. SMF 186 (Ex. R, and Exhibit K thereto) | The balcony is deeper and "more furnishable." SMF 187 (Ex. R, and Exhibit K thereto) | Balconies are different sizes |
| Balcony | Unit has balcony access via a sliding glass door. SMF 196 (Ex. R, and Exhibit K thereto) | Unit has balcony access via french doors. SMF 197 (Ex. R, and Exhibit K thereto) | |

| Koch Comparison of Dissimilarities in Unit A1 and A4 | | | |
|---|---|---|---|
| | Architects Collective Unit A1 | Pucciano & English Unit A4 | Court's Observations |
| Linen Closet | Does not have linen closet. SMF 188 (Ex. R, and Exhibit K thereto) | Linen closet located near bath entry. SMF 189 (Ex. R, and Exhibit K thereto) | |
| Living Room | Window has two separate sashes. SMF 190 (Ex. R, and Exhibit K thereto) | Windows have double combined sash. SMF 191 (Ex. R, and Exhibit K thereto) | The AC unit has two separated windows. P&E's unit has two side-by-side windows. |
| Fireplace | The unit has a fireplace centered on exterior wall. SMF 192 (Ex. R, and Exhibit K thereto) | The unit does not have a fireplace. SMF 193 (Ex. R, and Exhibit K thereto) | |

(Ex. R, Koch 2nd Addendum Report, and Exhibit K thereto, Doc. 82–12.)

Kester's side-by-side comparison (Image A) and unit plan overlay (Image B) show that Architects Collective's Unit A1 is visually very similar (but not identical) to Pucciano & English's Unit A4 with respect to the layout of the rooms and the individual standard features and fixtures within each of the rooms.

**Image A**

**UNIT PLAN A1**

ARCHITECTS COLLECTIVE

REFER TO AC SWIFT CREEK PLANS INCLUDED

**UNIT PLAN A4**
PUCCIANO & ENGLISH

REFER TO P&E MAYBANK PLANS INCLUDED
SHEETS A4, A27, A28 and A29

(Doc. 89–3 at 10.)

**Image B**

UNIT PLAN A1
ARCHITECTS COLLECTIVE
IN RED
REFER TO AC SWIFT CREEK
PLANS INCLUDED

UNIT PLAN A4
PUCCIANO & ENGLISH

REFER TO P&E MAYBANK PLANS INCLUDED
SHEETS A4, A27, A28 and A29

(Doc. 89–3 at 11.) However, a court can find floor plans are visually similar with the same type of general layout yet find their dissimilarities significant. *Howard,* 974 F.2d at 1276; *Intervest,* 554 F.3d at 916–18, 921–22. In fact, the overlay shown in Image B above, demonstrates the existence of such differences.

Some similarities are present beyond the simple general room layout, including the placement of doors, appliances, and bathroom and kitchen fixtures. Although Kester asserts that the Architects Collective Unit A1 and the Pucciano & English Unit A4 have similar kitchen arrangements and arrangement of kitchen appliances, the Court finds significant differences with respect to the design of the two kitchens. The Architects Collect Unit A1 uses a standard U-shaped cabinet design while the Pucciano & English Unit A4 incorporates a floating island design. The only similarity in the appliance arrangement is the location of the refrigerator. The stove and sink are arranged in different locations in the plans.

Other notable differences include the angle of the entry door wall, direction of door swing, window type and placement, the location of the mechanical equipment room, the size of the balcony, the layout of the laundry/utility area, the addition of linen closet, and the omission of a fireplace. Consistent with controlling Eleventh Circuit precedent, the Court finds these differences in the protectable elements of the Architects Collective Unit A1 Plan and the Pucciano & English Unit A4 Plan (even if only subtle or modest) to be material and significant for purposes of the infringement analysis. *See Howard,* 974 F.2d at 1276; *Intervest,* 554 F.3d at 916–22; *Home Design .Servs.,* 825 F.3d at 1319–22. The Eleventh Circuit has repeatedly held that despite similarities in general room layout "any differences between two floor plans 'would weigh heavily against a finding of substantial similarity.' " *Miller's Ale House,* 702 F.3d at 1326 (quoting *Oravec,* 527 F.3d at 1227); *Home Design Servs.,* 825 F.3d at 1324.

For example, in *Howard v. Sterchi,* the Court of Appeals upheld a finding of non-

infringement on summary judgment by the defendant who was alleged to have copied the plaintiff's residential floor plan. 974 F.2d at 1275–76. In determining whether the defendant's plan was substantially similar to the plaintiff's plan, the district court evaluated the plans' points of similarity and dissimilarity. *Id.* at 1276. On the one hand, the district court noted the following similarities: (1) overall layout and proportions; (2) two floors; (3) three bedrooms/two baths; (4) master bedroom on right side of first floor; (5) downstairs bathroom has tub/upstairs has shower; (6) kitchen in center rear; (7) combined dining room and living room (parlor) on left side of first floor with fireplace at center of interior wall; (8) stairs in center, facing main entry, master closet under stairs, linen closet to right of stairs on second level; (9) small deck at rear entry off of kitchen; and (10) nearly identical placement of windows. *Id.* On the other hand, the district court found the following differences: (1) dimensions of the rooms and the total area (1080 square feet of heated space versus 1212 square feet); (2) roof lines; (3) bay window at left rear; (4) location of range, refrigerator, washer and dryer; (5) open shelving in kitchen; (6) placement of commode and lavatory in first floor bath; and (7) door placement or orientation (right or left-handed opening) in first floor bath, coat closet, master bedroom and closets. *Id.* In the end, the district court held that, "although the floor plans are visually similar and the layout is generally the same, the dissimilarities are significant, particularly the roof lines, the bay window and the dimensions." *Id.* On appeal, the Eleventh Circuit found that the district court did not err in determining that the dissimilarities were significant and granting summary judgment to the defendant on the plaintiff's claim of copyright infringement:

> The [district] court noted that in country style frame houses and in houses built with logs which dictate that only square angles be used, similarities in the general layout of rooms can easily occur innocently. The variety of ways a two-story rectangle can be divided into three bedrooms, two baths, a kitchen, a great room or living room, closets, porches, etc., is finite. In architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works. *Cf. Original Appalachian Artworks, Inc. v. Toy Loft,* 684 F.2d 821, 830 (11th Cir.1982) ... [Plaintiffs] have failed to establish by a preponderance of the evidence the substantial similarity of the plans required to show copyright infringement.

*Id.*

Similarly, in *Intervest*, the Eleventh Circuit upheld the district court's grant of summary judgment and concluded that no reasonable jury could deem the particular floor plans at issue to be substantially similar at the level of protected expression. 554 F.3d at 921. The similarities between the floor plans noted by the district court were: (1) each plan included a four-bedroom house, with one bedroom being denominated as a "master" bedroom or suite, (2) each floor plan included a: two-car garage; living room; dining room; "family" room; foyer; "master" bathroom; kitchen; second bathroom; nook; and porch/patio, (3) the square footage of both floor plans was approximately the same. *Id.* at 916. Although the floor plans shared the same general layout, the district court "undertook a careful comparative analysis of the selection, coordination, and arrangement of common components and elements [and] focused upon the dissimilarities in [that] coordination and arrangement." *Id.* The differences noted by the district court included, among others: minor dimensional discrepancies between the plans' rooms, slight changes in the presence, arrangement, or function of various features including entrances, windows, doors, closets,

water heater/HVAC, incremental modifications to a number of walls, and a smattering of other dissimilarities such as differences in bathroom and kitchen fixtures and counters, the use of French doors vs. sliding doors. *Id.* at 916–18. While in the abstract, the differences might appear "modest," the district court ruled that these differences precluded a finding that the floor plans were substantially similar at the level of protected expression, and the Eleventh Circuit affirmed. *Id.* at 921. In sum, "[b]ecause the layouts were noncopyrightable, and because the floor plans differed in terms of dimensions, wall placement, and the presence and arrangement of particular features (or use of slightly varied features), the Court held that the similarities between the plans concerned only their noncopyrightable elements." *Home Design Services*, 825 F.3d at 1324 (discussing *Intervest* ).

Finally, in *Home Design Services*, the Eleventh Circuit upheld the district court's post-trial finding that "no jury following the court's instructions on the law could reasonably find the [plaintiff] and [defendant's] designs substantially similar given the amount of significant dissimilarities between the plans at the level of protected expression." 825 F.3d at 1320, 1325–26. The district court in *Home Design Services* observed that both plans depicted a common " 'four-three split plan': a four-bedroom, three-bathroom house with a 'master' bedroom or suite on one end and three more bedrooms on the other," and "share in common the same set of rooms, arranged in the same overall layout, [and] share the presence, location, and function of many (but not all) walls, entryways, windows, and fixtures." *Id.* at 1316. The district court, and the Eleventh Circuit on appeal, concluded that there was no infringement. Despite the plans sharing the same general layout, the Eleventh Circuit noted this was "only because both sets of plans follow the customary four-three split

style, as well as the attendant industry standards." *Id.* at 1325 (citing testimony of plaintiff's own expert witness who conceded that the room layout aligned with industry standards). The Court found, based on all the evidence that "the shared or similar elements between the two plans were non-protectable elements." *Id.* By contrast, with respect to the potentially protectable elements, the Court found they were not substantially similar:

> The differences between [defendant's] and the [plaintiff's] plans are differences in dimensions, wall placement, and the presence, arrangement, and function of particular features around the house. Because the same sorts of differences indicated no infringement in *Intervest*, that result follows in this case as well. *See Intervest*, 554 F.3d at 916–18.

*Id.* at 1326 (noting differences pointed out by defendant's architectural expert Robert Koch regarding such elements and features as the size of front porch, use of different types of doors throughout the various rooms, lack of cased openings in foyer, location of fireplace, use of different types of windows, differences in ceiling height living room, etc).

As the Eleventh Circuit announced in *Home Design Servs.*, "[i]f the similarity between two works concerns only noncopyrightable elements," then there can be no copyright infringement as a matter of law." 825 F.3d at 1324. This is because "[c]ustomary styles and efficiency—or expectation-driven industry standards are not susceptible to copyright. And when floor plans are drawn in a customary style and to industry standards, even 'subtle' differences ... can indicate there is no copyright infringement" because such standards "often control room placement and features." *Id.* (internal citations omitted).

For these reasons, the Court finds that although there are certainly similarities

between Architects Collective and Pucciano & English's one-bedroom Unit A plans, the dissimilarities identified above are sufficient to be dispositive. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to the alleged infringement of Architects Collective's One Bedroom Unit A1 Plan.

### 2. Two Bedroom (B) Units

 Plaintiff contends that the Two Bedroom Units (B2) have the following general similarities:

1. Overall form, look and feel of the dwelling units;

2. Overall layout of primary spaces and certain secondary spaces of the dwelling units;

3. Kitchen arrangements, arrangement of kitchen appliances, and use and location of kitchen windows;

4. Location of all windows in dwelling units;

5. Use of long two lavatory vanities in master bath;

6. Use of garden tubs in master bath;

7. Location of laundry room;

8. Location of patio/balcony access door;

9. Use of full glass patio/balcony access door;

10. Location of plumbing walls;

11. Location of all doors in dwelling units;

12. Use of U-shaped kitchen;

13. Nine (9) foot ceiling heights;

14. Vaulted ceilings in top floor units;

15. Specifically designed crown molding in living and dining rooms; and

16. Use of ceiling fans.

(Ex. L to Pl.'s Resp., Doc. 90–12 at 6–9.) As stated above, however, despite the fact that the plans share in common the same set of rooms, arranged in the same overall layout, these shared elements are not copyrightable elements. *E.g., Home Design Servs.*, 825 F.3d at 1326; *Medallion Homes Gulf Coast, Inc. v. Tivoli Homes of Sarasota, Inc.*, 656 Fed.Appx. 450, 454–55 (11th Cir. 2016)

Thus, the Court turns to Kester's comparison of similarities in the individual design elements of Architects Collective's Unit B2 and Pucciano & English's Unit B2 plans, identified as follows:

| Kester Comparison of Similarities in Unit B2 Plans | | |
|---|---|---|
| | Architects Collective Unit B2 | Pucciano & English Unit B2 |
| Entry Access Door[14] | Located adjacent to utility space and leads into narrow entry way (Ex. N, ¶ 7) | Located adjacent to utility space and leads into narrow entry way (Ex. N, ¶ 8) |
| Utility Space | Unit has outward-swinging double door, as opposed to a single door, sliding door, or other type of door (Ex. N, ¶ 9) | Unit has outward-swinging double door, as opposed to a single door, sliding door, or other type of door (Ex. N, ¶ 10) |
| Utility Space[15] | Designed for a side-by-side washer/dryer as opposed to stackable washer/dryer units (Ex. N, ¶ 11) | Designed for a side-by-side washer/dryer as opposed to stackable washer/dryer units (Ex. N, ¶ 12) |
| Water heater/furnace | Located directly next to utility space (Ex. N, ¶ 13) | Located directly next to utility space (Ex. N, ¶ 14) |
| Water heater/furnace[16] | Setup includes wall-mounted furnace and water heater that sits underneath (Ex. N, ¶ 15) | Setup includes wall-mounted furnace and water heater that sits underneath (Ex. N, ¶ 16) |
| Bathroom "master" (right side) | Double vanity along right wall (Ex. N, ¶ 17) | Double vanity along right wall (Ex. N, ¶ 18) |
| Bathroom "master" (right side) | Toilet is next to double vanity on right wall (Ex. N, ¶ 19) | Toilet is next to double vanity on right wall (Ex. N, ¶ 20) |
| Bathroom "master" (right side) | Garden tub located along left wall (Ex. N, ¶ 21) | Garden tub located along left wall (Ex. N, ¶ 22) |
| Linen Closet | Located directly across from entry of "master" bedroom (Ex. N, ¶ 23) | Located directly across from entry of "master" bedroom (Ex. N, ¶ 24) |

14. According to Mr. Koch, the "choice of exit system [ ] dictates the likely placement of the unit entry door relative to exterior walls of the building and the living areas within." (Ex. D at 10.) Thus, in his opinion the location of an entry door is not an original design element and any similarities in the plans regarding the location of an entry door would not constitute infringement.

15. The Court notes, however, that the utility space in the Architects Collective unit is located on the left side of the entry area while in the Pucciano & English unit the utility space is located on the right side of the entry area.

16. The Court is unable to visually verify from the plans whether Mr. Kester's description of the setup of the water heater/furnace is accurate.

| Kester Comparison of Similarities in Unit B2 Plans | | |
|---|---|---|
| | Architects Collective Unit B2 | Pucciano & English Unit B2 |
| Linen Closet | Door hinged on left and swings out into unit (Ex. N, ¶ 25) | Door hinged on left and swings out into unit (Ex. N, ¶ 26) |
| "Master" bedroom (right side) | Door hinged on left and swings out into bedroom (Ex. N, ¶ 27) | Door hinged on left and swings out into bedroom (Ex. N, ¶ 28) |
| "Master" bedroom (right side)[17] | Window located along lower, outside wall (Ex. N, ¶ 29) | Window located along lower, outside wall (Ex. N, ¶ 30) |
| Balcony/Patio access door | Located off the dining area (Ex. N, ¶ 31) | Located off the dining area (Ex. N, ¶ 32) |
| Dining area | Unit has two windows, one located along outer left wall and the other along the lower, outer wall (Ex. N, ¶ 33) | Unit has two windows, one located along outer left wall and the other along the lower, outer wall (Ex. N, ¶ 34) |
| Fireplace[18] | Located along common wall with kitchen on left side of living room (Ex. N, ¶ 35) | Although not shown in plans (shown as option along outer wall), as constructed fireplace is located along the common wall with kitchen on left side of living room (Ex. N, ¶ 36) |
| Kitchen | Window located above sink (Ex. N, ¶ 37) | Window located above sink (Ex. N, ¶ 38) |
| Kitchen | U-shaped kitchen that can only be accessed by walking through the dining room (Ex. N, ¶ 39) | U-shaped kitchen that can only be accessed by walking through the dining room (Ex. N, ¶ 40) |
| Kitchen | Sink located in the middle of the counter that runs along the left side of the kitchen (Ex. N, ¶ 41) | Sink located in the middle of the counter that runs along the left side of the kitchen (Ex. N, ¶ 42) |

17. The Court notes, however, that the Architects Collective Unit has double side-by-side windows while the Pucciano & English unit has two separate windows.

18. Alan Levow testified that the Pucciano & English plans were designed to place the fireplace on the wall with the two windows. During construction, however, Crowne Partners determined that the space was not large enough, so they moved the fireplace to the small wall behind the kitchen as the only logical place to put the fireplace in the unit. (Levow Dep. at 31–32.)

| Kester Comparison of Similarities in Unit B2 Plans | | |
|---|---|---|
| | Architects Collective Unit B2 | Pucciano & English Unit B2 |
| Kitchen[19] | Stove/oven unit is located in the middle of the counter that runs along the back kitchen wall (Ex. N, ¶ 43) | Stove/oven unit is located in the middle of the counter that runs along the back kitchen wall (Ex. N, ¶ 44) |
| Kitchen | Refrigerator located toward end of counter on right kitchen wall (Ex. N, ¶ 45) | Refrigerator located toward end of counter on right kitchen wall (Ex. N, ¶ 46) |
| Bedroom 2 (left side) | Entry door located toward bottom of right bedroom wall, directly off living room (Ex. N, ¶ 47) | Entry door located toward bottom of right bedroom wall, directly off living room (Ex. N, ¶ 48) |
| Bedroom 2 (left side) | Door is left-hinged and swings into bedroom (Ex. N, ¶ 49) | Door is left-hinged and swings into bedroom (Ex. N, ¶ 50) |
| Bathroom 2 (left side) | Vanity is located along the right wall of bathroom (Ex. N, ¶ 51) | Vanity is located along the right wall of bathroom (Ex. N, ¶ 52) |
| Bathroom 2 (left side) | Lavatory is located on the right bathroom wall in between vanity and bathtub (Ex. N, ¶ 53) | Lavatory is located on the right bathroom wall in between vanity and bathtub (Ex. N, ¶ 54) |
| Bathroom 2 (left side)[20] | Bathtub located along back wall of bathroom (Ex. N, ¶ 55) | Bathtub located along back wall of bathroom (Ex. N, ¶ 56) |

(Ex. N to Pl.'s Resp., Doc. 90–14 at 1–6.)

Mr. Koch compared the Unit B2 plans of Architects Collective and Pucciano & English and found that the only similarities in unit design were the layout as a two bedroom, double master based on industry standards and the standard U-shaped kitchen layout. (Ex. D, and Exhibit D thereto, Doc. 82–5 at 22.) The chart below details the multitude of dissimilarities identified by Mr. Koch between Architects Collective's and Pucciano & English's Unit B2 plans, along with the Court's observations:

19. The Court also notes that the kitchens are identical in shape, layout, and appliance arrangement.

20. The Court notes, however, that there is no bathtub apparent in the Pucciano & English plan.

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Overall dimensions | Unit has overall dimensions of 34'-8" x 40'-0". SMF 27 (Ex. D "Koch Expert Report", and Exhibit D thereto) | Unit has overall dimensions of 37'-0" x 39'-4". SMF 28. (Ex. D "Koch Expert Report", and Exhibit D thereto) | Sizes are almost identical but slightly different |
| Entry Door | Entry door hinged on right side. SMF 29. (Ex. D, and Exhibit D thereto) | Entry door hinged on left side. SMF 30. (Ex. D, and Exhibit D thereto) | |
| Entry Door | The unit has an entry door with limited pull clearance. SMF 31 (Ex. D, and Exhibit D thereto) | The unit has an entry door with ADA-compliant pull clearance. SMF 32 (Ex. D, and Exhibit D thereto) | In AC plan, the entry door and laundry closet door cannot be opened at the same time. In the P&E plan, the entry door and laundry closet door can be opened simultaneously. Unable to determine from P&E plan ADA compliance. |
| Laundry Closet | The laundry closet is placed to the right side of the unit entry. SMF 33 (Ex. D, and Exhibit D thereto) | The laundry closet is placed to the left side of the unit entry. SMF 34 (Ex. D, and Exhibit D thereto) | |
| Laundry Closet | The laundry closet is minimally sized. SMF 35 (Ex. D, and Exhibit D thereto) | The laundry closet is slightly oversized. SMF 36 (Ex. D, and Exhibit D thereto) | The exact dimensions of laundry closets are unclear from plans in Exhibit D. |

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Mechanical Equip. Room | The mechanical equipment room is placed to the right side of the unit entry. SMF 37 (Ex. D, and Exhibit D thereto) | The mechanical equipment room is placed to the left side of the unit entry. SMF 38 (Ex. D, and Exhibit D thereto) | |
| Mechanical Equip. Room | The mechanical equipment room has a concealed access panel. SMF 39 (Ex. D, and Exhibit D thereto) | The mechanical equipment room has a standard access door. SMF 40 (Ex. D, and Exhibit D thereto) | It appears in AC plan that mechanical equipment room is accessed through a closet off the entry while in P&E plan the mechanical equipment room is accessed directly from the entry. |
| Entry Closet | There is an entry closet behind the entry door. SMF 41 (Ex. D, and Exhibit D thereto) | There is an entry closet near the master bedroom 1 door. SMF 42 (Ex. D, and Exhibit D thereto) | Characterization is incorrect – Koch appears to have gotten mixed up between the plans. There is no entry closet behind the entry door in the AC plan. There is an entry closet behind the entry door in the P&E plan. Both plans include an "entry" closet at the end of the entry area near the door to master bedroom 1. These "entry" closets are placed in the exact same location. |

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Master Bedroom 1 | Master bedroom has 3 internal doors. SMF 43 (Ex. D, and Exhibit D thereto) | Master bedroom 1 has two internal doors. SMF 44 (Ex. D, and Exhibit D thereto) | P&E plan has 2 internal doors (a door to enter/exit the bedroom and a door to enter/exit the bathroom/closet). AC plan has 3 internal doors (a door to enter/exit the bedroom; a door to enter/exit the bathroom; and a door to enter/exit the closet). |
| Master Bedroom 1 | Master bedroom 1 has split closet. SMF 45 (Ex. D, and Exhibit D thereto) | Master bedroom 1 has single closet. SMF 46 (Ex. D, and Exhibit D thereto) | AC plan has 1 long narrow closet off the bathroom with a separate small walk-in closet at opposite end of bedroom (adjacent to balcony). P&E has a single walk-in closet off the bathroom. |
| Master Bedroom 1 | Master bedroom 1 has a small walk-in closet. SMF 47 (Ex. D, and Exhibit D thereto) | Master bedroom 1 has no walk-in closet. SMF 48 (Ex. D, and Exhibit D thereto) | AC plan has 2 closets – 1 long narrow closet off the bathroom with a separate small walk-in closet at opposite end of bedroom (adjacent to balcony). P&E has a single walk-in closet off the bathroom – the closet is not directly attached to the bedroom. Instead, the closet is located through the bathroom. |

| Koch Comparison of Dissimilarities in B2 Units | | |
|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Master Bathroom 1 | Master bathroom 1 has a side-wall between the vanity and the water closet. SMF 49 (Ex. D, and Exhibit D thereto) | Master bathroom 1 does not have a side-wall between the vanity and the water closet. SMF 50 (Ex. D, and Exhibit D thereto) | |
| Master Bathroom 1 | Master bathroom 1 has a linen closet in the bathroom. SMF 51 (Ex. D, and Exhibit D thereto) | Master bathroom 1 has a linen closet "at the [bedroom] vestibule." SMF 52 (Ex. D, and Exhibit D thereto)[21] | P&E plan does not include a linen closet in the master bathroom, instead the linen closet is outside the bedroom across from the bedroom door. |
| Master Bathroom 1 | Master bathroom 1 has a "ribbon" closet with a double door. SMF 53 (Ex. D, and Exhibit D thereto) | Master bathroom 1 has a walk-in closet with a single door. SMF 54 (Ex. D, and Exhibit D thereto) | AC plan has a long narrow closet with double doors to the left side of the bathroom across from sink/vanity before the tub. P&E plan includes a walk-in closet with single door at far end of bathroom behind tub and toilet. |
| Master Bathroom 1 | The master bathroom 1 door swings outward into the bedroom. SMF 55 (Ex. D, and Exhibit D thereto) | The master bathroom 1 door swings inward into the bathroom. SMF 56 (Ex. D, and Exhibit D thereto) | |

21. Defendant's SMF ¶ 52 erroneously states that the "P & E B2 master bathroom 1 has a linen closet at the bathroom vestibule. *See* Ex. D, and Exhibit D thereto." Exhibit D to Dr. Koch's Report instead provides that the linen closet for Master Bathroom 1 is located "at bedroom vestibule." (Doc. 82–5 at 23.)

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Living Room | Living room has fireplace accent wall on which fireplace is placed. SMF 57 (Ex. D, and Exhibit D thereto) | The living room includes an optional fireplace that may be placed on a different wall than the fireplace in Architects Collective's plan. SMF 58 (Ex. D, and Exhibit D thereto) | Though plans show fireplace on different walls, Alan Levow testified that the Pucciano & English plans were designed to place the fireplace on the wall with the two windows. During construction, however, Crowne Partners determined that the space was not large enough, so they moved the fireplace to the small wall behind the kitchen as the only logical place to put the fireplace in the unit. (Levow Dep. at 31-32.) |
| Living Room | The living room has a two-leaf sliding glass door. SMF 59 (Ex. D, and Exhibit D thereto) | The living room does not have a sliding glass door and only has two windows. SMF 60 (Ex. D, and Exhibit D thereto) | It is unclear whether AC plan uses "two-leaf sliding glass door" or double window. |
| Living Room | The living room opening to the dining area is larger than Pucciano & English's opening to the dining area. SMF 61 (Ex. D, and Exhibit D thereto) | The living room opening to the dining area is smaller than Architects Collective's opening to the dining area. SMF 62 (Ex. D, and Exhibit D thereto) | No ascertainable dimensions are provided in Exhibit D regarding either plan. It is possible opening in AC plan is slightly larger, but cannot determine whether it is a material difference. |

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Living Room | The living room is designed so that the second master bedroom and bathroom doors are shielded from the living room by their placement. The doors are not directly viewable from the living room. SMF 63 (Ex. D, and Exhibit D thereto) | The living room is designed so that the second master bedroom and bathroom doors are not shielded from the living room by their placement. There is a direct view of those doors in the living room. SMF 64 (Ex. D, and Exhibit D thereto) | In the AC plan, the door to the bathroom 2 is around an alcove and is likely not viewable from the living room. The bedroom door has only been obstructed by the fireplace and appears viewable from the living room. In the P&E plan, doors to both bedroom and bath are directly viewable from living room. |
| Patio | The unit does not have exterior patio/deck storage. SMF 65 (Ex. D, and Exhibit D thereto) | The unit has exterior patio/deck storage. SMF 66 (Ex. D, and Exhibit D thereto) | |
| Patio | The door to the patio swings inward into the dining room. SMF 67 (Ex. D, and Exhibit D thereto) | The door to the patio swings outward into the patio. SMF 68 (Ex. D, and Exhibit D thereto) | |

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Dining Room | The dining room casing has casing into the kitchen on the side wall on both sides.SMF 69 (Ex. D, and Exhibit D thereto) | The dining room casing into the kitchen does not have side wall casing. SMF 70 (Ex. D, and Exhibit D thereto) | Unclear from plans. Appears Mr. Koch made an error and switched the plans. In his report he notes for the AC plan "side wall both sides" and for the P&E plan he notes "no side wall." But the AC plan referenced does not appear to show any side walls, while the P&E plan shows two small sidewalls between the dining room and kitchen. |
| Master Bedroom 2 | Master bedroom 2 has a bay window. SMF 71 (Ex. D, and Exhibit D thereto) | Master bedroom 2 has a pair of windows. SMF 72 (Ex. D, and Exhibit D thereto) | |
| Master Bedroom 2 | The master bedroom 2 closet is placed against the master bathroom 2 wall. SMF 73 (Ex. D, and Exhibit D thereto) | The master bedroom 2 closet is placed against the "stair wall." SMF 74 (Ex. D, and Exhibit D thereto) | Unclear from plans what is the "stair wall," as no stairs are shown in theplans. In AC plan, the closet is located between the bedroom and bathroom. In P&E plan, the closet is located on the "outside" wall, i.e. the same wall as the entry. |
| Master Bedroom 2 | Master bedroom 2 does not have direct bathroom access. SMF 75 (Ex. D, and Exhibit D thereto) | Master bedroom 2 has direct bathroom access. SMF 76 (Ex. D, and Exhibit D thereto) | |

| Koch Comparison of Dissimilarities in B2 Units | | | |
|---|---|---|---|
| | Architects Collective B2 | Pucciano & English B2 | Court's Observations |
| Master Bedroom 2 | The master bedroom 2 closet is deep and narrow. SMF 77 (Ex. D, and Exhibit D thereto) | The master bedroom 2 closet is wide and shallow. SMF 78 (Ex. D, and Exhibit D thereto) | No ascertainable dimensions are provided for either plan in Exhibit D. The closets appear the same width, but P&E closet appears "longer." Closets are shaped slightly differently. |
| Master Bedroom 2 | Master bedroom has single closet door. SMF 80 (Ex. D, and Exhibit D thereto) | Master bedroom has double set of closet doors. SMF 81 (Ex. D, and Exhibit D thereto) | |
| Master Bathroom 2 | Master bathroom 2 does not have linen closet storage. SMF 82 (Ex. D, and Exhibit D thereto) | Master bedroom 2 has a linen closet. SMF 83 (Ex. D, and Exhibit D thereto) | |
| Master Bathroom 2 | The master bathroom 2 vanity has a centered sink. SMF 84 (Ex. D, and Exhibit D thereto) | The master bathroom 2 vanity has an offset sink. SMF 85 (Ex. D, and Exhibit D thereto) | |
| Master Bathroom 2 | Master bathroom 2 has a combined tub and shower. SMF 86 (Ex. D, and Exhibit D thereto) | Master bathroom 2 has a walk-in shower. SMF 87 (Ex. D, and Exhibit D thereto) | Unclear if AC plan has shower/tub combo or if P&E plan has walk-in shower. Clear that AC plan has a tub and P&E does not. |

(Koch Report, Ex. D and Exhibit D thereto.)

Larry Kester's side-by-side comparison (Image A) shows that Architects Collective's Unit B2 is somewhat visually similar to Pucciano & English's Unit B2 with respect to the layout of the rooms and the individual features and fixtures within each of the rooms.

**Image A**

 

UNIT PLAN B2
ARCHITECTS COLLECTIVE
REFER TO AC SWIFT CREEK
PLANS INCLUDED

UNIT PLAN B2
PUCCIANO & ENGLISH
REFER TO P&E CARY PARK PLANS INCLUDED
SHEETS C1, A1 through A6

As with the Unit A overlay comparison, while there are similarities in the overall plan, the unit plan overlay (Image B) of the B2 Units below also demonstrates numerous differences in the plans, including differences in room shape and dimensions, wall placement, and the presence, arrangement, and function of particular features in the units such as doors, windows, and other fixtures.

**Image B**

UNIT PLAN B2
ARCHITECTS COLLECTIVE
IN RED
REFER TO AC SWIFT CREEK
PLANS INCLUDED

UNIT PLAN B2
PUCCIANO & ENGLISH
REFER TO P&E CARY PARK PLANS INCLUDED
SHEETS C1, A1 through A6

(Doc. 89–3 at 6–7.)

Aside from the similarities in the "general layout," of the floor plan, i.e. the arrangement of the various rooms in relation to one another according to industry standards, other similarities are apparent. These include the placement of various doors, windows, the identical arrangement of the fixtures in both bathrooms, the arrangement of the laundry area, the location of the fireplace, and the identical arrangement of all elements of the kitchen and appliances. At the same time, a number of differences are present with respect to some of these same design features including, placement of various doors and

closets, the use of a double window in lieu of a sliding glass door, and differences in the size of certain room openings and closets. In light of the controlling authority in this Circuit, these "modest dissimilarities" are more significant when dealing with architectural designs. Such "modest dissimilarities" indicate that these plans differ where it matters: at the level of protectable expression. *Intervest*, 554 F.3d at 921. The Court thus concludes as a matter of law that the differences must be regarded as substantial and dispositive, and that the similarities between the Architects Collective Unit B2 and Pucciano & English Unit B2 floor plans exist for the most part at a broad conceptual level, which is not protectable under the Copyright Act.

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to the alleged infringement of Architects Collective's Two Bedroom Unit B2 Plan.

### 3. Three Bedroom Units

As noted above, Plaintiff originally contended, when the Complaint was filed, that Defendant's C1 three bedroom unit plan infringed Plaintiff's three bedroom Unit C2.2 plan. During discovery, however, upon receiving a full set of Defendant's plans, Mr. Kester determined that Defendant's C1 three bedroom unit plan bears "a more substantial and striking similarity" to his three bedroom Unit C2 plan and is "the most applicable plan to support [Plaintiff's] claims that Defendant Pucciano & English infringed Plaintiff's unit plans." (Doc. 116.)[22] This was made clear in Plaintiff's initial mandatory disclosures filed in this case. (Ex. L and Ex. N to Pl.'s Resp. to Def.'s SMF.)

While the Architects Collective Unit C2.2 and Unit C2 plans are very similar, there are material differences, most notably: (i) an interior entry stairwell in Unit C2.2 that is not present in Unit C2, (ii) differences in the size and shape of the various rooms, (iii) placement of the laundry room, and (iv) the inclusion of an additional bathroom in the Unit C2 plan. (*Compare* Doc. 1–2 *with* Doc. 89–3 at 4, 8, 14, and 18.) Thus, Plaintiff relies exclusively on a comparison of the Architects Collective Unit C2 plan (as opposed to the Unit C2.2) with the Pucciano & English Unit C1 plan in support of its infringement claim and in opposition to Defendant's summary judgment motion. A side-by-side comparison and unit plan overlay of Architects Collective's Unit C2 and Pucciano & English's Unit C1 is attached to this Order as Appendix A.

Defendant has offered no comparison of the Architects Collective Unit C2 plan with the Pucciano & English Unit C1 plan in support of its motion, and Mr. Koch does not address Architects Collective's Unit C2 in his expert report, though he had a copy of the C2 unit in his file. Instead, because Plaintiff only specifically referenced Architects Collective's Unit C2.2 attached as an exemplar to its Complaint, Defendant compared Architects Collective's Unit C2.2 and Pucciano & English's Unit C1 plans and those are the plans addressed by Mr. Koch in his expert report. Because Defendant has not undertaken its own comparison of the C2 and C1 three bedroom plans, the Court notes any obvious discrepancies in Plaintiff's description of the similarities or any differences clearly apparent from the plans (without the assistance of an architectural expert). The similarities identified by Mr. Kester between Architects Collective's Unit C2 and Pucciano & English's Unit C1 plans, along with the notable differences observed by the Court, are attached as Appendix B to this Order.

---

**22.** Defendant's Motion to Strike Plaintiff's Response to the Court's March 6, 2017 Order [Doc. 122] requesting clarification by the parties regarding the C2 and C2.2 plans is **DENIED.**

Mr. Koch, on the other hand, reviewed only the Architects Collective Unit C2.2 plan to determine its dissimilarities with Pucciano & English's Unit C1 plan.[23] Defendant's comparison of the three bedroom plans in its Statement of Material Facts is based on Mr. Koch's comparison using the Architects Collective Unit C2.2 plan. It would be reasonable to presume that Plaintiff's response to Defendant's Statement of Material Facts refers to the differences between the C2.2 unit plan and Pucciano & English's Unit C1 plan. However, the evidence Plaintiff relies on in support of its Response—Exhibit L (Kester's January 27, 2015 Supplemental Disclosure of Expert Testimony), Exhibit M (Plaintiff's Supplemental Responses to Interrogatories and Requests for Production of Documents), and Exhibit N (Kester's numbered narrative of comparisons of the unit plans)—all discuss the C2 unit plan and make no reference to the C2.2 unit plan. It therefore appears that Plaintiff has not provided a response regarding Koch's comparison using the C2 plan. A chart

detailing the dissimilarities between the C2.2 and C1 units noted by Mr. Koch, along with the Court's observations is attached as Appendix C to this Order.

Without the benefit of either (i) a comparison of the dissimilarities of the Architects Collective C2 unit by Mr. Koch, or (ii) a comparison of the similarities of the Architects Collective C2.2 unit by Mr. Kester, this Court cannot and will not, on its own, make a finding regarding whether these plans are substantially similar to Pucciano & English's C1 unit plan. Some similarities and dissimilarities are plainly obvious from "eyeballing" the plans (as noted in the Court's observation section of the charts attached). However, it would be imprudent for the Court to consider on summary judgment issues not directly addressed by the parties.

 Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment with respect to the alleged infringement of Architects Collective's Three Bedroom Unit C2 Plan.[24]

---

**23.** Exhibit E to the Koch report is entitled "Back to Back, Breezeway, Three Bedroom Split Layout End Cap Unit Floor Plan" and describes the "AC unit" as a "three bedroom-three bath program" and the "P & E Unit" as a "three bedroom-two bath program." (Ex. E to Koch Report, Doc. 82–5 at 26.) However, when beginning his discussion of the dissimilarities in a list format, Koch references the "AC 2 bed unit" and the "PE 2 bed unit." This appears to be a typographical error carried over from Exhibit D, as the attached plans that are the subject of Koch's comparison discussion in Exhibit E are for the Architects Collective Unit C2.2 and the Pucciano & English Unit C1.

**24.** Defendant also sought summary judgment on the basis that there is no evidence that Plaintiff suffered any damages as a result of the alleged infringement. Having granted summary judgment in Defendant's favor on Plaintiff's claims related to the one and two bedroom units, the Court need not decide the issue of damages. Having denied summary

judgment as to the three bedroom unit because of the parties' failure to properly present the issue to the Court, the damages argument is briefly addressed here. Under 17 U.S.C. § 504(b) of the Copyright Act, a successful plaintiff is entitled to both actual damages and "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). In an action for profits attributable to the infringement, the copyright owner is required to present proof of the infringer's gross revenue. *Id.* It is the infringer's burden to prove deductible expenses and the portion of profits attributable to factors other than the copyrighted plans. *Id.* Thus, the plaintiff has the burden of proof regarding (1) its actual damages and (2) the defendant's gross revenue. *Home Design Servs. v. Hibiscus Homes of Fla., Inc.*, No. 603CV1860ORL19KRS, 2005 U.S. Dist. LEXIS 32788 *16, 2005 WL 3445522, at *5 (M.D. Fla. Dec. 13, 2005) (citing *Data General Corp. v. Grumman Sys. Support Corp.* 36 F.3d 1147, 1173–74 (1st Cir. 1994)). According to Plain-

## IV. CONCLUSION

The Court takes pause to note the inherently subjective, fact-intensive nature of the substantial similarity inquiry—despite the Eleventh Circuit's delegation of the task to the judge rather than the jury. *See Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 825 F.3d 1314, 1328 (11th Cir. 2016) (Rosenbaum, concurring). As the Eleventh Circuit has previously stressed:

'At the most narrow, focused level, two works will almost always be distinguishable, and at the broadest level of abstraction they will almost always appear identical.' *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1316 (11th Cir. 2010). As a result, '[l]ists of similarities between the two works are inherently subjective and unreliable, particularly where the list contains random similarities, and many such similarities could be found in very dissimilar works' *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999) (internal quotation marks omitted).

*Id.* As a result, this Court's task involved the marshaling of numerous similarities and a few modest differences. "Architecture is not unlike poetry," observed Congress in amending the Copyright Act in 1990 in concluding that architecture is a "writing" protected under the Act. H.R. Rep. No. 101–735 (1990), as reprinted in 1990 U.S.C.C.A.N. 6935, 6941. And so, Nabokov's sentiment in *Pale Fire* is apropos: "Resemblances are the shadows of differences. Different people see different similarities and similar differences." Vladimir Nabokov, *Pale Fire* (1962).[25]

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Exclude Expert Testimony of Larry Kester [Doc. 81] and **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment [Doc. 82]. The Court also **DENIES** Defendant's Motion to Strike Plaintiff's Response to the Court's March 6, 2017 Order [Doc. 122] requesting clarification by the parties regarding the C2 and C2.2 plans. With respect to Plaintiff's only remaining claim, Defendant's alleged infringement of the Unit C2 three bedroom plan, the Court **ORDERS** Plaintiff and Defendant to private mediation. The parties shall advise the Court within work 5 days of the date of this Order if they cannot agree on a private mediator, in which case the Court will appoint one. Mediation shall conclude within 40 days of the date of this Order. In the event mediation is unsuccessful, the parties **SHALL** file their Consolidated Pretrial Order within 20 days of the conclusion of mediation. The Court **DIRECTS** the Clerk of the Court to administratively close this case and re-open it upon the filing of the Consolidated Pretrial Order. If the parties re-

---

tiff, Crowne Partners hired Pucciano & English to design apartment plans based on Plaintiff's copyrighted works, thus depriving Plaintiff of the profits it would have received had it been hired by Crowne Partners. Thus, if Plaintiff were to succeed on its claim regarding the three bedroom unit, the evidence gives rise to a reasonable inference that Plaintiff will be able to demonstrate at trial its damages and Defendant's gross revenues related to these projects. Where the evidence is in dispute, summary judgment on the issue of damages is not proper. Accordingly, the Court

**DENIES** Defendant's Motion for Summary Judgment on the issue of damages.

25. *Pale Fire* is a 1962 novel by Vladimir Nabokov embodied as a 999–line poem in four cantos written by the fictional poet John Shade. The title *Pale Fire* is from Shakespeare's Timon of Athens: "The moon's an arrant thief, / And her pale fire she snatches from the sun" (Act IV, scene 3), a line often taken as a metaphor about creativity and inspiration. *See* PALE FIRE, WIKIPEDIA, https://en.wikipedia.org/wiki/Pale Fire, (last visited Mar. 28, 2017).

**1372**

solve the case through mediation, they are **DIRECTED** to file a stipulation of dismissal.

**IT IS SO ORDERED** this 29th day of March, 2017.

APPENDIX A

A side-by-side comparison (Image A) and unit plan overlay (Image B) of Architects Collective's Unit C2 and Pucciano & English's Unit C1 is shown below:

**Image A**

 

UNIT PLAN C2
ARCHITECTS COLLECTIVE
REFER TO AC SWIFT CREEK
PLANS INCLUDED

UNIT PLAN C1
PUCCIANO & ENGLISH
REFER TO P&E CARY PARK PLANS INCLUDED
SHEETS C1, A1 through A6

**Image B**

**UNIT PLAN C2**
ARCHITECTS COLLECTIVE
IN RED
REFER TO AC SWIFT CREEK
PLANS INCLUDED

**UNIT PLAN C1**
PUCCIANO & ENGLISH
REFER TO P&E CARY PARK PLANS INCLUDED
SHEETS C1, A1 through A5

(Doc. 89–3 at 8–9.)

## APPENDIX B

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Entry Design | The entry design is a direct entry with an internal stair hinged on the right side. SMF 96 (Ex. D and Exhibit E thereto) | The entry design has access off of the communal exit assembly. SMF 97 (Ex. D and Exhibit E thereto) | Entry areas are similarly located within each unit. But entry doors are located in different areas on different unit walls. AC's entrance is located at far left end of unit with a stairwell up to the middle of the unit to a "foyer" area. P&E entry door is located on a different wall, opens up into the center of the unit, and is depicted as a foyer. Unclear from plans whether the entry has "access of the communal exit assembly" as described by Mr. Koch. |
| Overall Dimensions | Unit has overall dimensions of 38'-4" x 47'-8". SMF 94 (See Ex. D, and Exhibit E thereto.) | Unit has overall dimensions of 35'-0" x. 51'-3". SMF 95 (See Ex. D, and Exhibit E thereto.) | Units have approximately the same dimensions. AC unit is 3'-4" longer, but about 3' narrower than P&E unit. |
| Laundry Closet | The laundry closet is placed in the unit entry area. SMF 98 (Ex. D and Exhibit E thereto) | The laundry closet is placed in a hallway around the corner of the unit entry. SMF 99 (Ex. D and Exhibit E thereto) | |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Mechanical Equipment Room | The mechanical equipment room is in the unit entry area. SMF 100 (See Ex. D, and Exhibit E thereto.) | The mechanical equipment room is placed off the living room. SMF 101 (See Ex. D, and Exhibit E thereto.) | The P&E mechanical equipment room is placed off the living room to the left adjacent to a bedroom, closet, and kitchen. The AC mechanical equipment room is located to the right of the entry area adjacent to a bathroom. |
| Entry Closet | The entry closet is at the top of the interior stair. SMF 102 (Ex. D and Exhibit E thereto) | The entry closet is just beyond the foyer. SMF 103 (Ex. D and Exhibit E thereto) | The entry closet in AC is located at top of entry stairway. The entry closet in P&E is located at the end of foyer near entrance to living room and at end of hallway leading to laundry and bedroom/bath entrances on right side of unit. |
| Master Bedroom 1 | The master bedroom 1 door has a diagonal entry door. SMF 104 (Ex. D and Exhibit E thereto) | The master bedroom 1 door has a justified entry door. SMF 105 (Ex. D and Exhibit E thereto) | |
| Master Bedroom 1 | Master bedroom 1 has a bay window. SMF 106 (Ex. D and Ex. E). | Master bedroom 1 has a standard window. SMF 107 (Ex. D. and Ex. E). | |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Master Bedroom 1 | Master bedroom 1 has four internal doors. SMF 108 (Ex. D and Exhibit E thereto) | Master bedroom 1 has three internal doors. SMF 109 (Ex. D and Exhibit E thereto) | The AC bedroom has 4 doors (1 entry, double closet doors, 1 bath). The P&E bedroom has 3 doors (1 entry, 1 closet, 1 bath) |
| Master Bedroom 1 | The master bedroom 1 closet is a ribbon closet. SMF 110 (Ex. D and Exhibit E thereto) | The master bedroom 1 closet is a walk-in closet. SMF 111 (Ex. D and Exhibit E thereto) | Although the closets are in the same location, the closets have different shapes. AC plan has a long narrow close with 2 doors, P&E is a walk-in closet with 1 door. |
| Master Bathroom 1 | Master bathroom 1 is a basic 5' x 9' size. SMF 112 (Ex. D and Exhibit E thereto) | Master bathroom 1 is oversized. SMF 113 (Ex. D and Exhibit E thereto) | The bedrooms are located in the same area of the unit, but are slightly different sizes. Dimensions are not apparent from the plans. |
| Master Bathroom 1 | Master bathroom 1 has a single vanity. SMF 114 (Ex. D and Exhibit E thereto) | Master bathroom 1 has a double vanity. SMF 115 (Ex. D and Exhibit E thereto) | |
| Master Bathroom 1 | Master bathroom 1 has a tub on the stair wall. SMF 116 (Ex. D and Exhibit E thereto) | Master bathroom 1 has the tub on the living room wall. SMF 117 (Ex. D and Exhibit E thereto) | The tubs are located on different walls. They are also different shapes. |
| Master Bathroom 1 | The master bathroom 1 has a vanity on the living room wall. SMF 118 (Ex. D and Exhibit E thereto) | The master bathroom 1 has a vanity on the entry wall. SMF 119 (Ex. D and Exhibit E thereto) | |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Master Bathroom 1 | The master bathroom 1 has a toilet on the entry wall. SMF 120 (Ex. D and Exhibit E thereto) | The master bathroom 1 has a toilet on the exit wall. SMF 121 (Ex. D and Exhibit E thereto) | The toilets are located on different walls. |
| Living Room | The living room has a fireplace accent wall on which the fireplace is placed. SMF 122 (See Ex. D, and Exhibit E thereto.) | The living room has an optional fireplace that may be placed on a different wall than Architects Collective's fireplace. SMF 123 (See Ex. D, and Exhibit E thereto.) | Based on the plans, the fireplaces are located on different walls. However, Alan Levow testified that the P&E plans were designed to place the fireplace on the wall with the two windows. During construction, however, Crowne Partners determined that the space was not large enough, so they moved the fireplace to the small wall behind the kitchen as the only logical place to put the fireplace in the unit. (Levow Dep. at 31-32.) |
| Living Room | The living room has two adjoined windows. SMF 124 (Ex. D and Ex. E). | The living room has two windows that are separated. SMF 125 (Ex. D. and Ex. E). | |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Living Room | The living room opening to the dining area is larger than Pucciano & English's opening. SMF 126 (Ex. D and Exhibit E thereto) | The living room opening to the dining area is smaller than Architects Collective's opening. SMF 127 (Ex. D and Exhibit E thereto) | The exact width of the openings is unclear from the plans, but the AC plan appears to be "slightly" larger. |
| Patio | The patio/deck has a walled execution. SMF 128 (Ex. D and Exhibit E thereto) | The patio/deck has an open corner execution. SMF 129 (Ex. D and Exhibit E thereto) | Unclear what is meant by "execution" but - the balcony in AC plan is surrounded on both sides by walls. The balcony in the P&E plan has an open corner (no wall) on the right side. |
| Dining Room | The Architects Collective dining room floor area is generous and larger than Pucciano & English's dining room floor area. SMF 130 (Ex. D and Exhibit E thereto) | The dining room area is smaller than the floor area in Architects Collective's plan. SMF 131 (Ex. D and Exhibit E thereto) | The exact dimensions of the dining rooms are unclear from the plans. The AC dining room appears slightly larger than the P&E dining room. |
| Dining Room | The dining room door to the patio/deck has a right-hand swing. SMF 132 (Ex. D and Exhibit E thereto) | The dining room door to the patio/deck has a left-hand swing. SMF 133 (Ex. D and Exhibit E thereto) | |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Dining Room | The dining room casing has casing into the kitchen on the side wall on both sides. SMF 134 (Ex. D, and Exhibit E thereto). | The dining room casing into the kitchen does not have side wall casing. SMF 135 (Ex. D, and Exhibit E thereto). | Unclear from plans. Appears Mr. Koch made an error and switched the plans. In his report regarding the dining room "casing into the kitchen," he notes for the AC plan "side wall both sides" and for the P&E plan he notes "no side wall." However, the AC plan referenced does not appear to show any side walls, while the P&E plan shows two small sidewalls between the dining room and kitchen. |
| Kitchen | The kitchen is slightly larger than Pucciano & English's kitchen. SMF 136 (Ex. D and Exhibit E thereto) | The kitchen is slightly smaller than Architects Collective's kitchen. SMF 137 (Ex. D and Exhibit E thereto) | The exact dimensions of the kitchens are unclear from the plans, but AC kitchen appears slightly larger. |
| Kitchen | The hall bedroom 2 door is located close to the living room. SMF 138 (Ex. D and Exhibit E thereto) | The hall bedroom 2 door is located close to the bedroom. SMF 139 (Ex. D and Exhibit E thereto). | Koch refers to the bedroom across from the hall bath as "hall bedroom 2." In the AC plan, the door is located on the right side of the bedroom wall adjoining the hall. In the P&E plan, the door is on the left side of that same wall closer to the other hall bedroom. |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | |
|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Hall Bedroom 2 | The hall bedroom 2 closet is located on the front face of the unit. SMF 140 (Ex. D and Exhibit E thereto) | The hall bedroom 2 closet is located on the corner of the unit. SMF 141 (Ex. D and Exhibit E thereto) | The closets of hall bedroom 2 are located in different places. In the AC unit, the closet is located on the "front" wall and on the left side of the room that adjoins the living room and porch. In the P&E unit, the closet is located on the opposite side of the room. |
| Hall Bathroom | The hall bathroom is a basic 5' x 9' size. SMF 142 (Ex. D and Exhibit E thereto) | The hall bathroom is oversized. SMF 143 (Ex. D and Exhibit E thereto) | The exact dimensions of the hall bathrooms are unclear from the plans, but the AC hall bath appears smaller. |
| Hall Bathroom | The hall bathroom has a combined tub/shower. SMF 144 (Ex. D and Exhibit E thereto) | The hall bathroom has a walk-in shower. SMF 145 (Ex. D and Exhibit E thereto) | It is unclear if P&E's plan includes a walk-in shower and it is unclear if AC has tub/shower combo as only the tub can be seen in the plans. The P&E plan does not appear to have a tub, so the area designated by Mr. Koch could be a walk-in shower. There is a difference apparent from the plans in that a tub is shown in the AC plan but no tub is shown in the P&E plan. |

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Hall Bathroom | The hall bathroom vanity is placed to the left side of the bathroom. SMF 146 (Ex. D and Exhibit E thereto) | The hall bathroom vanity is placed to the right side of the bathroom. SMF 147 (Ex. D and Exhibit E thereto) | |
| Hall Bathroom | The hall bathroom does not have a linen closet. SMF 148 (Ex. D and Exhibit E thereto) | The hall bathroom has a linen closet. SMF 149 (Ex. D and Exhibit E thereto) | |
| Hall Bedroom 3 | Hall bedroom 3 is styled as a second master bedroom. SMF 150 (Ex. D and Exhibit E thereto) | Hall bedroom 3 is styled as a secondary bedroom. SMF 151 (Ex. D and Exhibit E thereto) | In the AC plan, the remaining bedroom referred to by Mr. Koch as hall bedroom 3 has its own separate bathroom and walk-in closet and therefore appears to be styled as a master bedroom. In the P&E plan, hall bedroom 3 does not have its own separate bathroom. |
| Hall Bedroom 3 | Hall bedroom 3 is oversized. SMF 152 (Ex. D, and Exhibit E thereto). | Hall bedroom 3 is of a basic secondary bedroom size. SMF 153 (Ex. D, and Exhibit E thereto.) | In the AC plan, hall bedroom 3 is rectangular and therefore longer than the square shaped hall bedroom 3 in the P&E plan. |
| Hall Bedroom 3 | Hall bedroom 3 has a double window. SMF 154 (Ex. D and Exhibit E thereto) | Hall bedroom 3 has a single window. SMF 155 (Ex. D and Exhibit E thereto) | |
| Hall Bedroom 3 | Hall bedroom 3 includes a private bathroom. SMF 156 (Ex. D, and Exhibit E thereto.) | Hall bedroom 3 does not include a private bathroom. SMF 157 (Ex. D, and Exhibit E thereto.) | |

1382

| Koch Comparison of Unit Plan C2.2 and Unit Plan C1 | | | |
|---|---|---|---|
| | Architects Collective Unit C2.2 | Pucciano & English Unit C2 | Court's Observations |
| Hall Bedroom 3 | Hall bedroom 3 has an oversized walk-in closet. SMF 158 (Ex. D and Exhibit E thereto) | Hall bedroom 3 has a standard sized closet. SMf 159 (Ex. D and Exhibit E thereto) | The exact dimensions of the closets is unclear from the plans, but the closets are different shapes and the AC walk-in closet appears larger than the P&E walk-in closet. |
| Hall Bedroom 3 | Hall bedroom 3 has a closet placed on a party wall. SMF 160 (Ex. D and Exhibit E thereto) | Hall bedroom 3 has the closet placed on an outside wall. SMF 161 (Ex. D and Exhibit E thereto) | The closets are located on opposite sides of the room and on different walls. |
| Building Plan | The building plans within which Architects Collective's unit is included are back to back, direct entry, stacked two-story exit assembly. SMF 162 (Ex. D and Exhibit E thereto) | The building plans within which Pucciano & English's unit is included are of two types: an interior corridor exit, midrise building, and a back to back, 2 and 4 unit breezeway exit assembly. SMF 163 (Ex. D and Exhibit E thereto) | Cannot determine from expert report because the only plans attached to Mr. Koch's report are the individual unit plans - no building plans are attached. |
| Overall Unit Design | The overall unit design is a three bedroom/three bath program design. SMF 164 (Ex. D and Exhibit E thereto) | The overall unit design is a three bedroom/two bath program design. SMF 165 (Ex. D and Exhibit E thereto) | |
| Overall Unit Design | Modification on the standard three bedroom par-tee. SMF 166 (Ex. D, and Exhibit E thereto). | Standard three bedroom unit plan par-tee. SMF 167 (Ex. D, and Exhibit E thereto). | Plaintiff admits this difference, but notes it is cosmetic only. |

**APPENDIX C**

| Kester Comparison of Similarities in C2 and C1 Unit Plans | | | |
|---|---|---|---|
| | Architects Collective Unit C2 | Pucciano & English Unit C1 | Noted Differences |
| Entry Access Door[1] | Located toward middle of outer unit wall, along the top of the unit plan. (Ex. N, ¶ 63) | Located toward the middle of the outer unit wall, along the top of the unit plan. (Ex. N, ¶ 64) | |
| Utility Area | Designed for a side-by-side washer/dryer unit as opposed to a stackable washer/dryer unit. (Ex. N, ¶ 65) | Designed for a side-by-side washer/dryer unit as opposed to a stackable washer/dryer unit. (Ex. N, ¶ 66) | Accurate description of washer/dryer set up, though the utility areas are shaped differently in the units. |
| Bathroom (Right) | Located on the top right side of the unit plan next to a bedroom and closet. (Ex. N. ¶ 69) | Located on the top right side of the unit plan next to a bedroom and closet. (Ex. N. ¶ 70) | Bathrooms are both located in same area of unit, although the bedrooms and closets referenced are located in different areas in each unit. |
| Bathroom (Right) | Toilet is centrally located on the back wall of the bathroom. (Ex. N. ¶ 71) | Toilet is centrally located on the back wall of the bathroom. (Ex. N. ¶ 72) | |
| Bathroom (Right)[2] | Linen closet is located along the right wall of the bathroom. (Ex. N. ¶ 73) | Linen closet is located along the right wall of the bathroom. (Ex. N. ¶ 74) | |

1. The Court also notes that both entry doors are located on the left side of the entry area and appear hinged on the right to swing into the entry area.

2. The Court also notes that the linen closets are located to the right of the entry into the bathrooms in each unit.

| Kester Comparison of Similarities in C2 and C1 Unit Plans | | | |
|---|---|---|---|
| | Architects Collective Unit C2 | Pucciano & English Unit C1 | Noted Differences |
| Bathroom (Right) | Linen closet door is right-hinged and swings out into the bathroom. (Ex. N. ¶ 75) | Linen closet door is right-hinged and swings out into the bathroom. (Ex. N. ¶ 76) | |
| Bedroom "3" (Farthest Right) | Entry door is right-hinged and swings into the bedroom. (Ex. N. ¶ 77) | Entry door is right-hinged and swings into the bedroom. (Ex. N. ¶ 78) | |
| Bedroom "3" (Farthest Right) | Window located along lower wall of unit plan. (Ex. N. ¶ 79) | Window located along lower wall of unit plan. (Ex. N. ¶ 80) | |
| Entry/Linen Closet | Unit has linen closet located off the entry access door. (Ex. N. ¶ 81) | Unit has linen closet located off the entry access door. (Ex. N. ¶ 82) | The closet in the P&E unit is designated as a coat closet and is located at end of and to left of entry area (not off the access door). |
| Bedroom "2" (Right) | Window located on along lower wall of unit plan. (Ex. N. ¶ 83) | Window located on lower wall of unit plan. (Ex. N. ¶ 84) | While both windows are located on the lower wall of the unit plan, the window in the AC unit is on the right side of the wall and the window in the P&E unit is centered on the wall. |
| Living Room | Has two windows located on wall adjacent to balcony. (Ex. N. ¶ 85) | Has two windows located on wall adjacent to balcony. (Ex. N. ¶ 85) | Correct, although AC unit window is a side-by-side double window and the P&E unit has two separate windows. |

| Kester Comparison of Similarities in C2 and C1 Unit Plans | | | |
|---|---|---|---|
| | Architects Collective Unit C2 | Pucciano & English Unit C1 | Noted Differences |
| Balcony/Patio | Access door is located off the dining area. (Ex. N. ¶ 86) | Access door is located off the dining area. (Ex. N. ¶ 87) | |
| Dining Room | Has two windows, one located along the outer left wall and the other located along the lower, outer wall. (Ex. N. ¶ 88) | Has two windows, one located along the outer left wall and the other located along the lower, outer wall. (Ex. N. ¶ 89) | |
| Fireplace[3] | Located along the common wall with the kitchen on the left side of the living room. (Ex. N. ¶ 90) | Though not depicted in plans, as built the fireplace is located along the common wall with the kitchen on the left side of the living room. (Ex. N. ¶ 91) | |
| Kitchen | Window located above kitchen sink. (Ex. N. ¶ 92) | Window located above kitchen sink. (Ex. N. ¶ 93) | |
| Kitchen[4] | U-shaped that can only be accessed by walking through dining room. (Ex. N. ¶ 94) | U-shaped that can only be accessed by walking through dining room. (Ex. N. ¶ 95) | |

3. As noted above with respect to the two bedroom unit, Alan Levow testified that the Pucciano & English plans were designed to place the fireplace on the wall with the two windows. During construction, however, Crowne Partners determined that the space was not large enough, so they moved the fireplace to the small wall behind the kitchen as the only logical place to put the fireplace in the unit. (Levow Dep. at 31–32.)

4. The Court also notes that the kitchens in each unit are identical in shape, layout, and appliance arrangement.